UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

JOSE HENRY GONZALEZ,
Individually and on behalf of all
others similarly situated,

                        Plaintiff,

           -against-

AUTO-CHLOR SYSTEM OF NEW YORK
CITY, INC., et. al.,

                    Defendants.
---------------------------------------------------------------X

**AFFIDAVIT OF RONALD LACEY IN OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION**

Case No. 12-CV-3465 (BMC)

STATE OF NEW YORK  )
                         ) SS.:
COUNTY OF NASSAU  )

RONALD LACEY, being duly sworn, deposes and says:

1.    I am a thirty-three year old married man who has completed approximately three years of college in Construction Management (two years at Nassau Community College and one year at Borough Community College of Manhattan) since graduating high school in 1996.

2.    I began working for AUTO-CHLOR SYSTEM OF NEW YORK CITY, INC. (hereinafter "Auto-Chlor") on November 13, 2006 and have worked for Auto-Chlor for a little more than six years.

3.    Auto-Chlor is a company that leases commercial dishwashing equipment primarily to the restaurant industry, in addition to selling soap dispensers and similar cleaning products to customers and providing both service and repairs of commercial

dishwashing equipment.  There are essentially seven employment positions a person can hold while working for Auto-Chlor at the branch level, which include: (i) branch manager, (ii) salesperson, (iii) installer, (iv) route supervisor, (v) route driver, (vi) rebuilder and (vii) office manager.  The route drivers report to the route supervisor, if there is one, and all employees report to the branch manager.  The branch manager reports to the regional manager, and the regional manager reports to the Vice President. In the six years I have been with Auto-Chlor, I have never heard of a position called "technician" and have never known anyone to be employed at any branch with the title of "technician".

4.      I worked in the branch then located in Jamaica, Queens, which is now located in Richmond Hills, Queens ("Queens Branch"), from November 13, 2006 until September 10, 2012.  I worked as a Route Driver for approximately three and a half years, I worked as a salesman for one year and I worked as a Route Supervisor for one year.  Auto-Chlor supplied me with five uniforms and those uniforms are cleaned and maintained by Aramark Uniform Company.

5.      It was my responsibility as a Route Driver to take care of the customers on my route, to bring them product when needed, to sell them additional cleaning products that they may need, and to speak with customers about any payment delinquencies.  I was also required to document any work performed or product delivered to my customers by inputting the data into my handheld device or by completing a Customer Service Report (CSR) for service calls or when I was "on call".  The CSR states the time I arrived at the customer's location, the problem reported, if any, and what work, if any, I performed

while I was there.  It was my responsibility to complete and turn in a CSR to the Office

Manager at my branch at the end of business each day, or the next day if I was out at a

job "after hours" and did not return back to the office when the job was complete.

6.      As a route driver, I was paid $11.50 per hour in addition to commissions of

13% of my hand sales, plus full benefits, a retirement savings account, a 401K, as well as

paid vacations, holiday time and sick time.  The 401K plan is great as Auto-Chlor

actually contributes a percentage of my gross annual wages into my 401K and does not

require me to match those funds.  I have heard that a lot of employers are not even

offering a 401K plan anymore, so I feel fortunate to have one that does not require

matching funds.  In addition to my regular rate, I am also paid overtime at a premium rate

of one and one half times my regular rate plus the average of my commissions for the

week.

7.      While the branch's official "hours of operation" are from 7:30 A.M. until

4:30 P.M., my regular shift was Monday through Friday from 8:00 A.M. until 5:00 P.M.

During each scheduled shift, I would "clock in" at the beginning of my shift and then

"clock out" at the end of my shift if I was at the shop at 5:00 P.M.  I also took a lunch

break every day as required by my employer.  From 2006 until sometime in early 2012, I

was required and did take a one hour lunch break every day.  Sometime in early 2012,

however, Auto-Chlor shortened the mandatory lunch break time to thirty minutes as there

was a lot of complaints from the route employees that they could not get their work done

if they were required to take an entire hour off for lunch.  Auto-Chlor has made it

abundantly clear that every employee is required to take lunch every day and that the

3

employee is not permitted to work during their lunch break. I am pretty sure this requirement is written in the employee handbook and I know that the employees have been told many times, orally and in writing, that they were required to take a break.

If I was at the shop when I decided to take lunch, I would clock out for my lunch break. However, if I was on my route when I decided to stop for lunch, I obviously could not punch out, so I would write in my lunch break time on my Daily Driver's Log (DDL) or simply tell my branch manager when I took lunch when I returned to the shop. I was also allowed to take two fifteen minute "on the clock" breaks during the day as well.

8.     On those occasions when I was still with a customer at 5:00 P.M., I, naturally, would not leave the customer and would finish the job. If the customer's location was near the shop, I would then drive back to the shop to "clock out". If the customer's location was closer to my home, I would drive back to the shop to clock out at the end of the day.

9.     In addition to my regular shift, I was also required to be "on call" approximately once every six to eight weeks. The frequency of the times I was "on call" depended upon how many "route employees" were working with me at the time since we were "on call" on a rotation schedule with the other "route employees". A "route employee" consists of any employee (other than sales people) who "work in the field", which includes route drivers, installers and rebuilders. As the Queens Branch is one of the larger branches, servicing around 900 customers, there were, on average, 6-8 "route employees", which meant that I only had to work "on call" about once every two months.

I do not recall any occasion where I was ever required to work "on call" more than once every six to eight weeks unless, of course, I volunteered to cover someone else's shift. In the six years I worked as I route driver, I also do not recall anyone else ever working "on call" once every four weeks.

10. In any event, the purpose of having someone "on call" is to ensure that our customers are provided with service 24/7 in the event there is an emergency to which the customer needs our response outside of normal business hours. I knew when I was hired that I would be required to work "on call" as the person who interviewed me told me that I would be required to do so and I think I remember seeing something about it in the Employee Handbook that I was given on my first day of work. No one really "likes" to be on call, but we all do it as we know it is part of our job and it is a nice enhancement to our paychecks.

11. When I was "on call", I was not required to be at the office, but was free to go about my regular business with the condition that I had to keep my Auto-Chlor issued cell phone with me at all times. When a customer calls in after 4:30 P.M. and before 7:30 A.M. the following morning, or at any time between 4:30 P.M. on Friday until 7:30 A.M. on Monday, they receive a voicemail recording that states the office is closed and that, in an emergency only, the customer should leave a message and someone would get back to them. If a customer leaves a message, that voicemail message is automatically forwarded to the "on call" person's Auto-Chlor cell phone. The "on call" person then listens to the message and makes notes on both an "on call" log and a CSR indicating (i) the time he

left his house to respond to the call, (ii) date, (iii) the name of the customer, (iv) the problem reported by the customer and (v) his name.

12.     When I arrived at the customer's location, I would make a note on the CSR of the time I arrived and would also make notes of any work I performed. After the problem was either solved or I had determined it would require a follow up visit, I would make a notation on the CSR and the "on call" log, and then ask the customer to sign the CSR. If I had another call to respond to, I would then make a notation on the log of (a) the time that I was leaving the first customer to travel to the next customer's location, (b) the customer's name, (c) the problem reported, etc., for the next customer. If I did not have another call to respond to, I would drive home and make a notation on the "on call" log about the time I arrived at home. I would hand in my "on call" log and my CSRs on my next regular shift, which would be Monday if I was "on call" over the weekend.

13.     The payroll week at Auto-Chlor goes from Sunday to Saturaday and we are paid every two weeks based upon the Auto-Chlor service calendar. The "on call" week at the Queens Branch, however, went from Friday to Thursday. Since the "on call" week often overlapped with payroll, I knew that I needed to get my "on call" logs in for Friday and Saturday by first thing Monday morning if I wanted my "on call" time to be included in the next paycheck. I knew that, if I did not get my hours in on time, my time for those three days would likely be included on the next paycheck, or my manager would have to ask the payroll person to write me a second check for the week. I was pretty good about getting my time in, even if it meant sending my boss an email with my time. However, I

know that some of the other "on call" people were habitually late and would have to be reminded multiple times to get their logs in on time.

14.    In the six years I have worked for Auto-Chlor, I have always been paid for all "on call" time I have reported to Auto-Chlor.  I know that I have been paid for all of my "on call" time because I have compared what is printed on my paycheck stub with what I reported and the numbers always added up.  In the six years I have worked for Auto-Chlor, I have never known anyone to complain about their hours being wrong on their paycheck.

15.    More particularly, in the nearly six years I worked at the Queens Branch, I worked with all three of the people who are named in this action and/or submitted an affidavit in support of this motion and **not one of these three plaintiffs have <u>ever</u> complained to me that they were not compensated for any of their "on call" time.** Their claims that I ever spoke with them about their hours ever being shaved or that they supposedly told me that they thought their hours were being shaved is a complete and utter lie.  No such conversation ever happened and I have no knowledge of anyone, much less these three plaintiffs, ever complaining that they were not compensated for every single "on call" hour reported in the six years I have worked for Auto-Chlor.

16.    Just as I have always been paid for every single "on call" hour I have reported over the years, I have always been paid all overtime that I was entitled to at a premium rate of one and one half times my hourly rate plus the average of my commission for the week divided by the number of hours worked.  Just as none of these three individuals have ever told me that they thought they were not paid for all of their

"on call" time, none of these three individuals ever told me that they thought they were not paid time and a half for all hours worked in excess of forty hours in one week.

17.    In September 2012, I was transferred to the branch located in Plainview, New York ("Plainview Branch"), where I currently work as a Branch Manager.  There are 14 employees at this branch, which consist of myself, 2 salespeople, 1 installer, 1 route supervisor, 6 route drivers, 1 rebuilders, 1 office assistant and one office manager. In the Plainview Branch, the route drivers report to the route supervisor, everyone else reports to me, I report to Michael Bugiada, and Mike reports to Bruce Bertkau, the Vice President.

18.    As Branch Manager, I am responsible for all aspects of servicing the customers and managing the employees in my territory, which includes all of Long Island.  My specific job duties include management of all installations, service, repairs, route service and sales in my area.  In addition to the foregoing, I am also responsible for payroll, inventory, safety compliance, and the branch budget (i.e., preparing the profits and loss statements).

19.    As to the specific job duties of the employees at the Plainview Branch, their job titles pretty much speak for themselves.  The salesperson signs up the new business and resigns the existing customers at the end of their contracts.  The installer is responsible for installing the equipment after the contract is signed.  As noted above, the route drivers are responsible for servicing the customers on their route.  The route supervisor oversees the work of the route drivers in addition to working his own route. The rebuilder repairs and refurbishes the used equipment.  The office manager answers

the phone, dispatches the employees, handles the accounts receivable, invoices customers, and also inputs data into the computer system, such as new customer information and the customer route history from the information contained in the Customer Service Reports.

20.     Just like the Queens Branch, the "route employees" in the Plainview Branch are required to work "on call" on a rotation schedule with the other "route employees", which results in each employee being "on call" approximately once every two months depending upon how many "route employees" are employed at any given time.  Also similar to the Queens Branch, all of the employees at the Plainview Branch are well aware of the fact that their "on call" time is compensated from the time they leave their house until the time they arrive back home.

21.     Before I became the Branch Manager in Plainview, Paul Rivera was the Branch Manager.  It is my understanding from my review of the payroll records at the Plainview Branch and from my conversations with both the branch employees and Mike Bugiada that Paul Rivera essentially had four different ways that an employee could report "on call" time.  In addition to the requirement that the employee complete a CSR for each service call, the employee also reported his "on call" time by either (i) typing it into the computer themselves, or (ii) writing his "on call" time on (a) a log sheet, (b) his timecard, or (c) sending an email to his manager to advise of the time worked.  That stated, it appears that most employees used the CSR with an "on call" log method of recording their hours.

22.     My policy in the brief period that I have worked in Plainview is that I prefer that the employees write their time on the "on call" log or on their timecards, but, if the employee is in a pinch and wants that time to be included in the next payroll period, I have told my employees to email me their time and to then bring in their log and CSRs on the following Monday.

23.     While I know that several managers actually input the "on call" time on a daily basis, I generally tend to input the data from the "on call" logs and the timecards at the end of the payroll period as I find it easier to just do it all at one time and it is more likely I will have all of the logs from the employees if I wait.  So, at the end of each pay period, I collect all of the "on call" logs and time cards for the two weeks prior, and I type that information into a Payroll Timesheet on the computer.  If anything in the "on call" log or timecard does not look right or is missing, I will check the CSRs to see if I can locate the missing information and/or contact the employee to explain the discrepancy.  If the employee is physically in the office, I will ask the employee to fill in the missing information and/or to fix the error his or herself.  If the employee is not physically in the office, I will just input the correct information on the Payroll Timesheet after speaking with that employee or otherwise verifying the information.

24.     Once the Payroll Timesheets are complete, I then forward the Payroll Timesheets onto the Regional Manager, Mike Bugiada, for his review.  If Mike has a question about any time reported on the timesheets, he will contact me and I will double check the hard copy of the record to confirm that the information is accurate.  If I need further information, I will contact the employee to discuss the error or to get the missing

information and report it back to Mike.  Once Mike has approved all of the timesheets, I then forward the Payroll Timesheets to the Payroll Administrator, who collects all of the payroll spreadsheets for the branches, checks them once more for errata, and then forwards them onto ADP to have the payroll prepared.  If the Payroll Administrator sees anything out of the ordinary in the Payroll Timesheets, she will contact me to point it out and to ask me for more information.

25.     While I have only been a Branch Manager for a few months, I can say with confidence that no one has ever told me that I had to cut an employee's hours on their paycheck and no one has ever told me not to pay an employee any time that he or she worked.  Similarly, I have never reported any hours less than what the employee reported to me.  There is no incentive for me to report any time other than what the employee reported as my compensation is not contingent in any way upon how many hours the branch employees work.

26.     No employee at the Plainview Branch has ever complained to me that I, or anyone before me, ever cut their hours or did not pay them for all the time they worked. In fact, I believe that one of our attorneys actually interviewed all of the "on call" employees in relation to opposing this motion, and I have been advised that not one single employee said that they had ever been paid less than they were entitled to.

27.     If any employee had an issue with their paycheck, there is a clearly written procedure in the Employee Handbook that states what to do to rectify the situation.  The employee is required to first report the problem to their Branch Manager.  If they are not satisfied with the outcome of meeting with the Branch Manager, they are then required to

request a meeting with the Regional Manager to report the problem.  If they are not satisfied with what happens in their meeting with the Regional Manager, they are required to report the problem to the Human Resources ("HR") person in writing and she will perform an independent investigation into the problem.  Not only has no employee ever told me that they were shorted hours, I have never heard of any employee making such a complaint to Mike Bugiada, the Regional Manger, or the HR person.

### ...as to the claims made by JOSE HENRY GONZALEZ

28.     With regard to the claims made by JOSE HENRY GONZALEZ ("Henry") in his Complaint and his affidavit, I was very surprised to learn that Henry had filed this lawsuit and that I had been named as a witness.  Henry worked as an Installer in the Queens Branch, I believe, from the summer of 2007 until late 2010 or early 2011.  While he worked at Auto-Chlor, I liked Henry and he appeared to me to be a really hard worker, but I also knew that Henry received a lot of complaints from both salesman and customers.

29.     The complaints from the salesman were often the result of customer complaints because, quite frankly, Henry was not very good at his job, which was to install equipment at a new customer's location or to install new equipment at an existing customer's location.  Henry would often not install the equipment correctly and the salesman would hear complaints from their customers that the equipment did not work properly, which is not a good thing when you are trying to impress a new customer.  We would often have to send someone else to re-do what Henry was sent out to do.  Henry also felt that he was entitled to be rewarded by the customers when he serviced their

12

equipment, and I heard that he would get upset with the customers if they did not offer him free food or a tip after he completed his work.  The customers would get upset that Henry would demand such things from them and they would either call into complain to the Branch Manager, Sam Villanueva, or they would complain to their salesman or the route drivers.

30.     I also know that Henry did not take criticism well as he would get really defensive when Sam would confront him about the complaints.  In fact, I think Henry even quit or got fired once after Sam tried to speak with him about the customer complaints.  Henry got really defensive and began to say some really inappropriate things to Sam, and I believe that Sam either fired him for insubordination or he walked out.  Apparently, a few days later, Henry called Sam to ask for his job back and Sam agreed to rehire him.

31.     Again, I really did like Henry as a co-worker, but I will not lie for him and cannot believe that my name would be put down as a witness in this case.  Despite what he put in his Affidavit, I can honestly say that Henry has never complained to me that he felt he was being shorted on his hours, and I have never witnessed Henry complaining to Sam or Mike that he thought his paycheck was wrong.

32.     With regard to the specific allegations made in Henry's Complaint, it is my understanding that Henry makes the following claims in his Complaint: (i) he claims that he was supposedly not paid time and a half for all hours worked in excess of forty in one week; (ii) he claims that Auto-Chlor supposedly did not compensate employees for their

13

travel time while "on call", and (iii) he claims that Auto-Chlor supposedly had an obligation to clean the employees' uniforms and failed to do so.

33.     As to his first claim, while I have never seen Henry's paycheck that I can recall, I can say that I have always been paid time and a half for all hours worked in excess of forty hours in one week and I have never, ever heard Henry complain that he was not. I have also never heard any other employee complain about not being properly compensated for their overtime. I can further state that I *do* believe that there are other employees who are "similarly situated with Henry" as I believe that, based upon my six years with Auto-Chlor, both Henry and all other employees have always been paid time and a half for all hours worked in excess of forty hours in one week.

34.     As to Henry's second claim, again, while I do not recall ever seeing Henry's paycheck, I can state with certainty based upon my own experience at Auto-Chlor that I have always known that my "on call" compensation included my travel time to and from each job, and that I have always been compensated accordingly. Since I was advised that my "on call" time included travel time, it is reasonable to conclude that Henry, who started a year after me, was also told how to properly report his "on call" time. In any event, I have never been shorted "on call" time and have never, ever heard Henry complain that he was shorted "on call" time in the six years that I have been with Auto-Chlor. I can also state with certainty that I have never heard any other employee complain about being shorted hours and I am fairly certain that **everyone** knows that "on call" time includes travel time.

14

35.     As to Henry's third and final claim with regard to the uniform allowance, I have just learned what the "uniform allowance" is and, based upon the materials provided to me as a Branch Manager, I am certain that Henry would not qualify as it appears that this additional $3 per week is only for minimum wage employees.  In any event, our uniforms are cleaned by Aramark.

36.     As to Henry's claims in his affidavit, I find it peculiar that Henry would say that he worked for Auto-Chlor as a "technician" as no such title exists at Auto-Chlor. Henry's title was "installer" for the entire time he worked with me.  Henry also refers to Richard Keating ("Richie") and Paul Argento ("Paul") as "technicians".  To be clear, Richie's title was route driver until 2006 when he became a rebuilder, and Paul's title was route driver, like me.  As to Henry's claims about to how many employees worked at the Queens and Plainview branches, I am really not sure how Henry would know how many employees worked in Plainview during the 3.5 years he worked at the Queens Branch as he would have really had no reason to interact with the Plainview Branch.  In any event, I really do not know how many employees worked in Queens or Plainview from 2007 until 2011.

37.     In his affidavit, Henry states that he was paid $17.00-$17.50 per hour while he worked for Auto-Chlor and then claims that Richie and Paul were paid the same.  Paul was a route driver and Richie was a route driver until 2006.  As such, they would not have been compensated like Henry as they are in a completely different class.  The route drivers are quasi-salespeople with a hybrid of hourly and commission based compensation.  Thus, I know for a fact that Richie and Paul would not have received the

same compensation as Henry as they would have been classified differently. Henry then claims to have spoken with other "technicians" in Plainview and New Jersey about their compensation, which is clearly a lie as (a) I do not know anyone who openly talks about how much they get paid and (b) there would be no reason for Henry to be speaking with employees from the New Jersey or Plainview Branches as they service a completely different area.

38.     I can confirm that Henry's regular shift was from 8:00 A.M. to 5:00 P.M., but I do not believe his claim that he never took lunch was true as (a) Henry was not one to miss a meal and (b) Henry and all of the employees knew that they were required to take a one hour lunch break as that was a strict policy of Auto-Chlor. Henry's claim that he "almost never" is not true.

39.     Henry also claims to have worked "on call" for a whole week every four weeks, which is also not true. It is just silly that he claims, on the one hand, that there were 20 "on call" employees while he worked there, and then claims, on the other hand, that he had to work "on call" every four weeks. If we had 20 "on call" employees, that would have meant that we would have only had to work "on call" bi-annually. His claims just make no sense logically or mathematically. The reality is that we had approximately 6-8 "on call" employees at any given time and actually worked "on call" approximately once every six to eight weeks. So there is no way Henry worked on call one week every single four weeks.

40.     Henry also claims that customers would call in "installation jobs" for the "on call" workers to do. That is not true as (1) a customer would not call in an

installation job, installation jobs are scheduled by the salesman that signs up the customer, and (2) installation jobs are not considered "emergency services" and are not, therefore, generally done outside of our regular business hours.

41.     It does appear that Henry now admits in paragraph 11 of his affidavit that he *was* told to report his "on call" time from the time he left his home until the time he returned back to his home and that he was compensated accordingly.  I believe, however, that the process was a bit different as to how Henry received his "on call" dispatches as Henry did not speak English very well.  As I remember it, when Henry was "on call", the voicemails would be forwarded to another employee, who would then call Henry to tell him where he needed to go and what the problem was.

42.     I have no knowledge of Auto-Chlor checking up on "on call" employees by comparing what is written in an employee's "on call" log with the time on the voicemail system and the time put on the CSR.  Perhaps, what Henry is referring to is the fact that Henry often had to have his calls dispatched for him as there was a language barrier since Henry did not speak English very well.

43.     Even if there was any such policy, I am well aware of the fact that it is Auto-Chlor's policy that, if anyone is suspected of stealing from the company by padding their "on call" log, the branch manager is required to speak with that employee and to investigate the situation.  If the branch manager determines that the employee is stealing from the company by falsely reporting his "on call" time, the branch manager is required to pay the employee for the time reported, and then to either write up or fire that employee depending upon that employee's prior work history.  In my experience,

17

however, Auto-Chlor has never failed to pay an employee for his "on call" time even if it was suspected that the time he reported was false.

44.    While he never admitted it to me, I am pretty sure that Henry was one of the employees suspected of stealing from the company by falsely reporting his "on call" time. I have heard that there were several conversations between the Branch Manager, the Regional Manager, the Vice President, the Payroll Administrator and the owner about firing Henry well before he was ultimately fired as he always reported and was paid for exponentially more "on call" time than any other employee. Again, Henry never admitted anything to me, but that was the word around the shop.

45.    In any event, despite what Henry said in his affidavit, I have never known any manager of any branch to reduce his or my "on call" time, ever. I have also never heard any other employee say that he or she thought anyone reduced their hours at all.

46.    It also makes no sense that Henry would claim to have known every week that he was not paid properly for his "on call" time based upon what was in his "notes" and what was in his paycheck, and then never say anything about it. I mean, I worked with the guy for 3 and a half years, you would think that he would have said something to me, or that I would have at least overheard him say something to anyone if he was really being cheated out of 5-10 hours a week as he claims in his affidavit.

47.    The number of hours he claims to have been cheated also makes no sense for two reasons. First, there is no way someone would have stayed working for a place for three and a half years if they were really cheating him out of 5-10 hours at least one paycheck a month according to his story. Second, and more importantly, it is impossible

18

that he was being shorted 5-10 hrs for every "on call" week when the average "on call" hours reported for an "on call" week is only 7-15 hours in *total* "on call" time.  I mean, on a good week when I was bombarded with customer emergencies I may have worked 15-20 hours "on call", but that was not the standard.  For Henry to have been shorted 5-10 "on call" hours every time he was on call, he either (a) would not have been paid for any "on call" time at all considering the average week only yields 7-15 hours of "on call" time, or (b) he must have been seriously padding his "on call" time as there is simply no way he was working much more than an average of 15 hours a week when he was "on call".

48.     Despite Henry's claim that he supposedly complained "multiple times" to his manager about his supposed shortages, in the three and a half that I worked with Henry, I never heard him complain once about his "on call" time.

49.     I am not sure why Henry claims that he should have been paid premium overtime in paragraph 17 of his Affidavit.  He was an installer, not a salesman or a route driver, so he would have been entitled to regular overtime, not premium overtime.  If he was being paid premium overtime at all, that was a mistake, as only commissioned employees get premium overtime.

50.     In paragraphs 18 and 19 of his affidavit, Henry claims to have had conversations with other employees about how much they were paid and claims that these other employees told him they were also not paid for time and a half for all hours worked over forty in one week.  Again, in the more than six years that I have worked at Auto-Chlor I have **never** heard anyone at the Queens or Plainview Branches ever

complain to me--- **_Henry included_** ---about not being paid time and a half for all hours worked in excess of forty hours in one week. I have likewise have **never** heard anyone complain that they were ever "shorted" any hours.

51.     While I really do not have much interaction with the employees of the Bronx or Connecticut, and I could not imagine why Henry would have any contact with those branches either. In any event, in my limited communication with the employees from those branches, I have never once heard anyone claim that they were not paid time and a half for all hours worked over forty in one week and I have likewise never heard anyone claim that they were "shorted" hours. I have worked at the New Jersey, Queens and Plainview Branches and can affirmatively state that I have never heard any employee ever complain that they thought their hours were being shorted or that they were not receiving time and a half for all hours worked in excess of forty hours in one week.

52.     As to Henry's claim in paragraph 19 that he was supposedly not paid time and a half for all hours worked in excess of forty in one week, I am not aware of any such fact. I have always been paid time and a half for all overtime, and I guess you really just have to look at Henry's paycheck stubs to see whether what he is claiming is true. I suspect you are going to discover that it is not because we just report the hours to ADP and then ADP prepares the payroll and is responsible to make sure that it comports with New York Law. I could not imagine that ADP would have made a mistake and, if they did, perhaps Henry should be suing ADP and not Auto-Chlor.

53.     I was present on the day Henry was fired. Henry came into work one morning in January 2011 after he had been "on call" and appeared to be agitated for some

reason.  He walked over to the Branch Manager, Sam Villanueva, and told Sam that he did not want to work "on call" anymore.  He also told Sam that he wanted Sam to hire him a helper to assist him on the installations.  He further told Sam that he wanted a raise. He told Sam that, if he did not get all of these things, he wanted Sam to fire him so that he could collect unemployment.

54.     Sam responded by telling Henry that he could not give him a raise as there were too many complaints in his file from the salesmen and the customers, and that he was getting too much heat from his bosses to fire him because of all of the "on call" time they were already paying him for even though they were suspicious that he was taking advantage of the situation.  Sam also explained to Henry that it would be unfair to every other "on call" employee to exempt him from doing his "on call" rotation and that the more senior employees, like me, would not be too happy about working "on call" more frequently because he did not want to do it anymore.  Sam explained to Henry that, whether he liked it or not, being "on call" was part of the job.  Sam also told Henry that his bosses would never approve the hiring of an assistant for Henry when his position was always one held by one person and, if they were going to hire someone else, it would be to replace Henry.

55.     While Sam was speaking, Henry became really agitated and began insulting Sam, really crossing a line.  It almost appeared that Henry was trying to provoke Sam so that Sam would fire him even though Sam told him that he had no intention of firing him and that he should take the day off to cool down.  I also tried to calm Henry down and also tried to convince him to go home before he did something he would regret later.

21

Henry just kept begging Sam to fire him while insulting Sam at the same time.  Sam finally did fire him, saying something like, "you really want me to fire you, well, you've got your wish, your fired."

56.     At no point during this conversation did Henry every say that he was upset about being "shorted hours" or that he thought he was not being paid time and a half for his hours worked over forty in one week.  You would think that, in an exchange like this, if that was really the case, Henry would have at least mentioned something like that, but he did not.  That is why I think Henry is not telling the truth in his affidavit.  That is not what he complained about.  What he did complain about was wanting a raise, wanting an assistant, and wanting to be excluded from the "on call" rotation.

57.     After thinking about my experiences with Henry, what happened on his last day, and the statements he made in his complaint and affidavit that I know are not true, I do not believe that Henry is telling the truth at all in this case.  This surprises me as I really never took Henry as someone who would falsely accuse someone of something for money.  You really never know, I guess.

### ...as to the claims made by Richard Keating

58.     Richard Keating's ("Richie's") affidavit also surprised me as I never thought Richie had it in him either.  Richie worked for Auto-Chlor for several years before I got there and I cannot speak to what happened before November 2006, so any statements I make about Richie will be based upon my experience after November 2006 until he stopped working for Auto-Chlor sometime in 2011.

59.     Right around the time I started working for the Queens Branch in November 2006, Richie's position was changed to Rebuilder from Route Driver because Richie's health was getting bad as a result of diabetes.  Richie says his position was "technician", but I do not know where he was getting that from as I am not aware of any such position at Auto-Chlor.  What I do know is that it was my understanding that Richie was a route driver until 2006 and that he was a rebuilder from 2006 until he had to resign because of his diabetes.

60.     It is true that Auto-Chlor leases commercial dishwashing equipment and soap products to various customers in New York, Brooklyn, Queens, the Bronx and Long Island.

61.     While he was not a technician as there is no such title, as a Rebuilder, Richie had the responsibility of repairing and rebuilding commercial dish machines.  I am not aware of Richie installing any dishwashers as that would not have been his job, but it is possible that he installed a dishwasher as he worked for Auto-Chlor for a few years before me.

62.     Again, I am not aware of any position called "technician", but I do know that Henry worked as an installer and Richie worked as a rebuilder.  I do not recall ever working with anyone named "Abraham" in the six years I worked at the Queens Branch, but it is possible that "Abraham" was someone that worked there before 2006.  I am also not aware of any occasion where the employees would stand around and talk about their jobs.  I do not know when these conversations would occur or where as we spent most of

the day on our routes taking care of our customers.  I am not saying that they did not

happen, I am just saying that I was not a part of any such conversation.

63.     I do not know what Richie's exact compensation was, but I do know that

Route Drivers make around $11.00 per hour plus 13% commissions on their hand sales

and rebuilders make around $17.00 per hour.  So it could be true that Richie made $17.00

per hour when left, but there is no way his pay was the same the entire time he worked

for Auto-Chlor as there is no way he was making flat rate of $17.00 per hour as a route

driver.  We do not make a flat rate, but rather we make a base rate plus commissions.  So

it is really unlikely that Richie's pay never changed while he was at Auto-Chlor as his

position changed from Route Driver, a commissioned position, to Rebuilder.

64.     While Henry may have received similar compensation after Richie became

a rebuilder, Henry would not have made the same as Richie when he was a route driver

unless Richie's base hourly rate plus commissions happened to equal what Henry was

paid.

65.     Richie did work from 8:00 A.M. until 5:00 P.M., but he was required to

take a one hour lunch break every day as Auto-Chlor had a strict policy of requiring the

employees to take breaks.  The Branch Manager did not have a set schedule, the Office

Manager worked from 7:30 A.M. until 4:30 P.M. and all other employees worked from

8:00A.M. until 5:00 P.M. unless, of course, an employee was "on call" that night.

Everyone knew that we had to take a one hour lunch break and I do not think that it is

true that Richie supposedly "never took lunch".  I am even more suspect of this claim by

Richie as he was a diabetic, which I believe means that he must eat on a regular schedule to keep his blood sugar up.

66.     It is not true that Richie was "on call" once a week every single month.  As I said when talking about my experience with Henry, no one worked "on call" once a month every single month.  The "on call" rotation was more like once every six to eight weeks, so it is maybe true that he worked "on call" once every two months.  It is also important to remember that Richie would not have even worked "on call" that much as he was out on sick leave a lot from 2006 until 2011 because he was in the hospital a lot.  I remember that he was in the hospital at one point because the doctors told him that they were going to amputate his toe.  He was also off a lot at the end because he started losing his sight.  Since he was out on disability so often, I would be surprised if Richie worked on call more than 3-4 total times in his last couple of years.

67.     Richie's claim that being "on call" required him to be available 24 hours a day is partially true.  During the week from 7:30 A.M. until 4:30 P.M. the shop was open and there was no one "on call".  The only time he would have had to available to customers 24 hours a day would be from Friday night after 4:30 P.M. until Monday morning at 7:30 A.M. as there was always a full staff on during the day on the week days.  Richie's statement that "on call" time started from when he left his house until when he returned home was true, but his statement that he did "installations" after hours is not likely to be true.  Our "after hours" line was for emergencies only, so it is highly unlikely that anyone is going to call in an "installation" after hours.  It even more improbable as

the salespeople schedule the installations, not the customers, as a signed lease agreement is required before an installation occurs.

68. Richie's statement about how "on call" works with a voicemail from a customer and that the "on call" time starts to run when he leaves his house until he returns home is true. Richie's statement that he would give the "on call" sheets to the manager "at the end of each day being on-call" is partially true since the "on call" sheets were actually turned during the next regularly scheduled shift, not on the same day and sometimes it would be 2 days later if the "on call" time was worked on Friday night.

69. I am not aware of anyone ever reducing Richie's total number of "on call" hours worked, and Richie has never complained to me that this ever happened. I have also never heard anyone else say that Richie's time was being reduced, and I have never heard Richie complain to Sam or Mike that he thought his hours were being reduced. Likewise, no one has ever reduced my hours.

70. While I do not know what Richie did when he got his paycheck, Richie never told me that his hours on his paycheck did not accurately reflect the number of hours he worked. I also do not recall Sam, Mike or the route supervisor ever questioning Richie about his "on call" time, ever. I, again, cannot speak for what happened before 2006, but in the six years we worked together, I do not recall ever hearing that. I also never heard Richie complain that he was questioned about his "on call" time or that his pay was ever reduced by any time as a result.

71. While I cannot affirmatively say what did or did not happen with Richie's paycheck as he never talked to me about it, I can say that I never heard Richie complain

that he thought he was regularly shorted two hours from each paycheck and I have never, personally, been shorted any hours. I do find it suspect that someone would stay with a company for a decade if he really thought that he was being shorted two hours every week.

72.     While Richie would have been entitled to premium overtime for all hours worked in excess of forty in one week as a route driver, he would not have been entitled to premium overtime when he was a rebuilder as rebuilders do not get commissions. In any event, I have never heard Richie complain that he was not paid time and a half for all hours he worked over forty in one week, and I have always been paid premium overtime for all hours I have worked in excess of forty hours in one week.

73.     I am not aware of and was not party to any conversations between Richie, Henry and someone named "Abraham" about their pay. I have never heard of anyone complain about not getting paid for his or her "on call" time.

74.     I have never heard Richie or anyone else complain that he was not compensated time and a half for all hours worked in excess of forty hours in one week. I have always been paid time and a half for all of my time worked over forty hours in one week. Now that I am a Branch Manager, I also do not see how it is possible that Richie was not paid overtime because the hours are reported to ADP and ADP prepares the payroll based upon the hours worked in compliance with New York Law. I could not see a professional payroll preparation company making such a mistake or that Richie would not have said anything for ten years.

75.     While I cannot speak affirmatively as to what did or did not happen with Richie's paycheck, I can say that I have never had anything like Richie describes happen to me in the more than six years I have worked for Auto-Chlor and I have never heard any employee at any branch make a similar complaint.

76.     As I said previously, Richie had diabetes and he was often unable to work because of the side effects of having diabetes.  I know that sometime from in or about 2010 until 2011 Richie was out on short-term disability because his doctors wanted to amputate his toe.  As Richie was off much of this time, I could not imagine that he worked any "on call" shifts.  Richie was not back at work for long when he was out again because the diabetes was, apparently, affecting his sight.  I believe that Richie was out for much of 2011 because of this and that he finally had to quit sometime in 2011.  I believe that Richie is on permanent disability now and that he has not been able to work since he quit.

77.     I feel really bad for what Richie is going through as I could not imagine going through something like that.  While I am sympathetic to what he and his family is going through right now, I cannot lie for him out of guilt as that is just not who I am.

*...as to the claims made by Paul Argento*

78.     Paul Argento ("Paul") worked with me at the Queens Branch as Route Driver for about nine months, or from July 2008 until May 2009.  While Paul says that he worked as a "technician" I am aware of no such position at Auto-Chlor and always knew Paul to be a route driver, like me.

28

79.     Paul states that his primary duties were to repair and remove dishwashing machines, but that is not true.  The position of Route Driver is a quasi-sales position. Paul's primary job was to service the customers on his route, to make sure they were stocked with product, to sell them additional cleaning product that they may need, and to, occasionally, perform minor repairs to the equipment.  It was not Paul's job to remove dish machines and I am not aware of any occasion where Paul removed a dish machine.  I do not know that Paul is even qualified to remove a dish machine.

80.     As I am not aware of any other "Ron" working at Auto-Chlor when Paul was there, I am assuming that I am the "Ron" person who Paul is referencing in paragraph 4 of his affidavit.  While I admit to working with Paul, neither I nor Paul held the title of "technician", we were both Route Drivers.  I do not ever recall speaking with Paul about my duties as a Route Driver as I knew what my job was and I assumed that he knew what his job was.  I have also never heard any other route drivers standing around talking about what their job duties were.  We all knew what our job was, it was to service our customers on our route.

81.     While I do not know how much Paul was paid per hour, I do know that Paul was paid an hourly rate plus a commission for his hand sales.  To put it more simply, in addition to his hourly rate, Paul also made a 13% commission on all additional product sales he made while servicing his route.

82.     I agree that Paul's regular shift was from 8:00A.M. until 5:00 P.M. and that he may have worked past 5:00 P.M. on occasion when he was not finished with a customer at 5:00 P.M.  However, I do not think Paul is telling the truth when he says that

he often worked until 9:00 P.M. or 10:00 P.M. as that just does not happen unless a

person is "on call". I also do not think it is true that Paul "rarely took lunch breaks".

Everyone knew that Auto-Chlor had a strict lunch break policy and everyone took their

lunch breaks even if that break happened while that person was out of the office. As Paul

appeared to be kind of a slacker to me, I could not imagine that Paul would not have

taken every break he could get.

83.     While I agree that Paul worked "on call" on occasion, Paul never worked

"on call" once every four weeks as there was no way that happened. In the six years I

worked in Queens, when I worked "on call", I was "on call" about once every two

months and, occasionally, as often as every six weeks, but I do not recall *ever* being "on

call" once a month. This claim makes no logical sense as it would mean that we would

have only had four route employees, which includes installers, rebuilders, route

supervisors, route drivers and route trainees. This is impossible because, in the six years

I worked in Queens, there has always been at least one installer, one rebuilder, four or

five route drivers, a couple of route trainees and a route supervisor. Queens is one of the

larger branches, so it would not have been able to function with only four route

employees. There is just no way Paul worked "on call" once a month like he claims. In

fact, I would not be surprised if Paul only worked "on call" 3-4 times during the entire

time he worked for Auto-Chlor since he was only there from July to May.

84.     I agree that, when he was "on call", Paul would receive voicemail messages

from customers needing service, but I do not agree that any installations were being done

after hours and I do not think that Paul ever installed any equipment while he was

working for Auto-Chlor as I do not think he is even qualified to install a commercial dish machine. He was a quasi-sales person, like me, and that was not in our job description. Moreover, installations were scheduled by salespeople, not customers, after the customer signed a new lease agreement and, even if a customer did call in for an installation, an installation is not an "emergency" that would be handled by an "on call" person after hours.

85. I do agree with Paul that "on call" time was compensated from the time he left his home, or wherever he was, until the time he returned home or back to whatever he was doing.

86. I agree that we were required to write down our "on call" time on an "on call" sheet and to also record the work performed in a CSR for all work done "on call", and I also agree that we were required to turn in our "on call" sheets and CSRs on the next regularly scheduled shift. While that was the requirement, I do not know if Paul actually got his paperwork in on time as trying to get the route employees to turn in their paperwork on time has always been (and will likely always be) a struggle between the employees and the office manager and/or the branch manager. I have the same problem in the Plainview Branch and often tell my employees to just email me their time so that I can include it in the payroll.

87. I also agree with what Paul states in paragraph 10 about his "on call" time being compensated from the time he left his house until the time he returned home as that is how I was being compensated.

88.   While I do not know what Paul reported in his logs or how much Paul was paid, I can say that, as a route driver, I have never had my hours reduced by my manager and, as a branch manager, I have never reduced (nor have I ever been asked to reduce) any employee's hours.

89.   I am not aware of Paul ever not being compensated for any "on call" hours he worked and I never heard Paul complain that he thought he was being shorted hours to anyone.  More particularly, I have never heard Paul complain to me, any other employees, the Route Supervisor or the Branch Manager that he thought his hours were being shorted.  While Paul did not work for Auto-Chlor very long, I could not imagine someone working with me for nine months and not once mentioning that he thought the management was shorting his hours.  The fact that he never mentioned it and that it never happened to me leads me to believe that it did not happen.

90.   I am even more suspicious of Paul's claims considering that Paul next claims to have supposedly been shorted "five to ten hours of on-call time per week".  This never happened.  First of all, Paul worked "on call", at most, once every six to eight weeks.  Secondly, as stated above, it is my experience that the average "on call" time reported by me and now my employees in Plainview for an entire "on call" week is around 7-15 hours.  So for Paul to claim that he was supposedly shorted 5-10 hours every week is just absurd as (1) he did not work "on call" every week and (2) he likely only claimed around 10 hours "on call" per week on average.  If Paul was really shorted 5-10 hours a week, that means that he is claiming that he was not paid for most of his "on call" time, which is just crazy.  No one would continue to work for someone for a month,

much less nine months, if they thought their employer was making them work "on call" once a month and that they were not paying them.

91.     Again, while I do not recall ever seeing Paul's paycheck, I can also say that I do not believe that he was ever shorted 2 hours of overtime per week considering that (a) he never complained to me, or anyone else for that matter, that he thought he was being shorted overtime, and (b) I have never been shorted overtime in the six years I have worked at Auto-Chlor.

92.     Paul's entire paragraph 16 in his Affidavit as it pertains to me is a lie.  Paul never had a conversation with me about how many hours he was paid or that he thought he was not being paid for all of his "on call" time or overtime.  I have **never** had a conversation with Paul, John Colilo, John Colisimo and Cesar wherein we discussed what we were paid and I have never heard Paul, John Colilo, John Colisimo or Cesar ever complain that they thought their hours were being shorted.  I really do not know why Paul would name me as a witness and I do not know why he would think that I would lie for him.  The truth of the matter is that this conversation **never** happened.  Moreover, as we were commissioned employees, I would not have ever discussed my compensation with another commissioned employee.  It would have been totally inappropriate and did not happen.

93.     While I again do not know what was in Paul's particular paycheck, I can state that I have always been paid time and a half for every hour I have worked in excess of forty hours in one week and that I have never heard another employee in Queens, Plainview or New Jersey every complain that they were not.

## CONCLUSION

94.     Based upon my experience with Auto-Chlor for more than six years, I respectfully submit to this Court that it is my opinion that the claims made by the three individuals' affidavits are not true.

95.     I have worked for Auto-Chlor for more than six years and would not still be here if I thought my employer was not paying me what I was entitled to.  I certainly do not think that Richie would have stayed for a decade if he really thought he was being shorted hours or that Henry would have stayed for more than three years under those circumstances.  The fact of the matter remains that I never once heard any of them complain about what they were paid for in their paycheck and I never once had my hours shorted.

96.     I also know that Sam often compensates us for more "on call" time than we actually work if Sam notices that we reported a short break time in between calls.  Why would Sam do this if he was going to then short employees' hours?

97.     Based upon my experience of working with Sam Villanueva for the past six years, I can also say that he is not the type of boss to short an employee's hours.  Sam is a great boss who genuinely cares for his employees.  Sam is the type of boss who will visit you in the hospital and, if you tell him that you need more money, he will go out of his way to get it for you if it is possible.  Sam has always been good to me, he was always good to Richie and he was really good to Henry.  I know for a fact that Sam stuck his own neck out on multiple occasions to save Henry's job and I cannot believe that the thanks he gets is a bogus lawsuit.

98.     I can also say that, in the short time I have been a Branch Manager, no one has ever told me that I have to cut any employees' hours or that my job depends upon it. I can also state that I have never reduced or shorted anyone's hours, and that I have always just reported the hours in the documents to the payroll company through the Payroll Timesheet.

99.     Also based upon my experience over the past six years, I can confidently state that I do not feel that there are any employees who are similarly situated with these three people in what they claim happened as that has not been my experience and I have not heard anyone say that this has been their experience.

100.    As such, I respectfully request that the plaintiff's motion for conditional certification be denied in its entirety, and for such other, further and different relief as may seem just, proper and equitable to this Court.

_____
RONALD LACEY

Sworn to before me this
5th day of December 2012.

_____
NOTARY PUBLIC

DANIELE D. DE VOE
Notary Public, State of New York
No. 02DE6146226
Qualified in Nassau County
Commission Expires May 15, 2014

35