UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

JOSE HENRY GONZALEZ,
Individually and on behalf of all
others similarly situated,

                      Plaintiff,

           -against-

AUTO-CHLOR SYSTEM OF NEW YORK
CITY, INC., et. al.,

                    Defendants.

---------------------------------------------------------------X

**AFFIDAVIT OF SAM
VILLANUEVA IN
OPPOSITION TO
PLAINTIFF'S MOTION FOR
CONDITIONAL
CERTIFICATION**

Case No. 12-CV-3465 (BMC)

STATE OF NEW YORK)
               SS.:
COUNTY OF NASSAU)

    SAMUEL VILLANUEVA, being duly sworn, deposes and says:

    1.    I am a forty-two year old man.  While I am not married, I am engaged to a

beautiful woman named Kaaha.  After graduating high school, I attended New York

Institute of Technology for five years and then Williamstown University for

approximately one year to obtain my Bachelors of Technology degree in Electrical

Engineering in or about 1997.  In or about 1999, I received a Masters Degree in Business

Administration also from Williamstown University.

    2.    I was hired by AUTO-CHLOR SYSTEM OF NEW YORK CITY, INC.

("Auto-Chlor") on October 3, 2006 to work at the branch that was previously located in

Jamaica, Queens and that is now located in Richmond Hills, Queens ("Queens Branch"). I was hired to be the Branch Manager for the Queens Branch, a position that I still hold today.  As Branch Manager, I report to Michael Bugiada, the Regional Manager, and he reports to Bruce Bertkau, the Vice President.

3.     Auto-Chlor is a company that leases commercial dishwashing equipment to businesses in the restaurant industry, in addition to providing other products such as soap dispensers, cleaning products, as well as service and repairs.

4.     My duties as Branch Manager of the Queens Branch require me to manage every aspect of the day-to-day business of my branch and my territory, which covers Brooklyn and Queens.  This includes managing the service calls, maintaining payroll, tracking inventory, creating profit and loss statements, preparing annual budgets, managing customer accounts, as well as the hiring and firing employees.  I am paid a salary for my position as Branch Manager, but am also compensated for any time I work "on call", in addition to receiving medical benefits, paid vacation time, paid sick days, paid holidays, a 401k that my employer contributes to on an annual basis based upon a percentage of my gross wages without any required contribution from me, and am able to participate in profit sharing.

5.     In the Queens Branch, we currently have a total of fourteen employees including myself.  Those fourteen employees consist of five route drivers, one installer, one rebuilder, two route trainees, two salespersons, one office manager, one route supervisor and myself.  The five route drivers and two route trainees report to the route

supervisor, and the route supervisor and all of the of the other employees report to me. As noted above, I report to the Regional Manager, Michael Bugiada, and he reports to the Vice President, Bruce Bertkau.

6.      It is the job of the salespeople to sign up new business and to resign existing business.  It is the job of the installer to install the commercial dishwashing equipment.  It is the job of the route driver to manage their route by making sure their customers have enough product, that their machines are working properly, and to speak with customers about any delinquent payments.  The route trainees work with the route drivers.  The route supervisor not only manages the other route drivers, but he also has his own route to cover.  The rebuilder repairs, rebuilds and fixes the commercial dishwashing equipment.  The office manager manages the office by (i) collecting new contracts and inputting them into the computer system, (ii) collecting the CSR (Customer Service Reports) from the employees when they return from a service call and inputting the data into the computer system, (iii) invoicing the customers every four weeks for their payments under the service contract, (iv) answering the phone during regular business hours, and (v) assisting me with entering any other data into the computer system, such as inputting the weekly payroll.

7.      Our regular business hours are from 7:30 A.M. until 4:30 P.M. on Monday through Friday.  While our Office Manager works from 7:30 A.M. until 4:30 P.M., the other employees generally work from 8:00 A.M. until 5:00 P.M.  During the relevant period herein, every employee was required to take a one hour off the clock lunch break

every day.  Beginning in 2012, we have reduced the mandatory break time to thirty minutes.  Employees have been told both orally and in writing that they are required to take a break each day, and it is also stated in the Employee Handbook.

8.      We pay our employees every two weeks and our payroll periods are based upon Auto-Chlor's service calendar, which is broken up into thirteen four-week periods, which means that each employee receives two checks during each period: one paycheck for weeks one and two, and one paycheck for weeks three and four.  For the employees' regular shifts, each employee "clocks in" on a timecard at the beginning of each shift, "clocks out" during their mandatory lunch break if they are at the office and able to do so, and then "clocks out" at the end of his or her shift.  If the employee is not in the office when they take their lunch, they write in the time of their lunch period on their time card or report it to their supervisor each day.  Each employee will use two timecards during each pay period.  Side one of the first timecard tracks week one and side two tracks week two, just as side one of the second timecard tracks week three and side two tracks week four.  Our payroll week runs from Sunday through Saturday.

9.      As explicitly set forth in the Employee Handbook given to each employee, in addition to their regular shift, the route drivers, installers and rebuilders are required to work "on call" on a rotation schedule once every six to eight weeks (depending upon the total number of "on call" employees we have working for us at the time) to ensure that Auto-Chlor customers are provided with "round-the-clock service" in an emergency situation.  See Employee Handbook, p. 54.  An employee responds to a customer "on

4

call" strictly for emergencies and/or minor chemical delivery. No installations or dishwasher removals are ever handled outside of the regular business hours. Thus, out of the nine hundred customers serviced by the Queens Branch, there are only a few service calls each night an employee is "on call" with, of course, more on the weekends as the office is closed. As noted above, I also frequently work "on call" to assist the "on call" person when there are customers that need assistance.

10.     It is up to the discretion of each Branch Manager to find the best and most fair way to both divide up "on call" shifts and to ensure round-the-clock coverage for our customers. While I believe that most other branches have their "on call" weeks coincide with the payroll week, the Queens Branch "on call" week runs Friday through Thursday.

11.     When an employee is "on call", the phone system at the Queens Branch is programmed to forward all "after hours" emergency calls (or calls that come in after 4:30 P.M.) to the "on call" person's Auto-Chlor cell phone. When the "on call" person receives the customer's voicemail message, the employee is required to document the time they leave their home, or wherever they may be, on an "on call log sheet", in addition to the customer's name and a description of the problem being responded to.

While the employee is at the customer's location, he is also required to note his time of arrival, the problem complained of, the work performed and his time of departure on a CSR, or Customer Service Report, in addition to the "on call" log. After the work is complete, the "on call" employee asks the customer to review and sign the CSR. After the employee returns home, the employee is required to document the time he returns

home on the "on call" log sheet and the CSR.  The purpose of the "on call" log sheet and CSR is to not only keep track of an employee's "on call" time, but is also to maintain a record of all work performed for a customer and to ensure that all necessary follow up work taken care of.

12.     When an employee is "on call", the employee is required to turn in his "on call" log and CSRs on his next regularly scheduled workday.  While that is the rule, I am often hounding the employees to get me their "on call" logs and CSRs so that we can, not only, update the Customer Route History in the computer, but also so that payroll can be completed.  Despite my constant nagging, there are still some employees who frequently turn in their "on call" sheets late and I will have to add their "on call" time to their paychecks in the next pay period.

13.     Every two weeks, I gather the timecards and the "on call logs" and then either myself or my office manager transfers that data into a computerized spreadsheet, or Payroll Timesheet.  That timesheet then logs the employees' hours for the week, inclusive of both regular and "on call" time.  If there is any information missing on an employee's timecard, there is any errata or if any employee failed to input a start or end time on an "on call" log, I contact the employee to ask them for the missing information so that payroll can be completed.  While this mostly consists of a telephone call, if the employee is physically in the office, I ask the employee to revise his log or timecard himself.

14.     When all of the data has been transferred and all pertinent information has

been entered into the computer for the pay period, this information is then sent to

Regional Manager, Michael Bugiada, for his review.  It is my understanding that Mike

reviews the timesheets for errata and/or missing information, and then the Payroll

Timesheets and timecards are forwarded onto Auto-Chlor's Payroll Administrator.  It is

also my understanding that the Payroll Administrator then checks the timesheets once

more for errata and, once the timesheets for all of the branches have been collected and

checked, they are then sent to ADP, who prepares our payroll.

15.     If Mike or the Payroll Administrator notice that an employee's time is out

of the ordinary or that there appears to be an entry for holiday pay that was likely carried

over from the prior pay period, either Mike or the Payroll Administrator contact me to

inquire about the discrepancy and I investigate the discrepancy and speak with the

employee to get more information, if need be, and the record is fixed.  More often than

not, unless the discrepancy was clearly a typo (i.e. an employee took a sick day in the

*prior* pay period that was inadvertently left on the spreadsheet for the *next* pay period),

after review of the payroll records, I would tell the Payroll Administrator to pay the hours

reported by the employee even if they seemed excessive.

16.     As the sample records provided to this Court will reveal, other than paying

the employees for ***more*** time than they reported on the "on call" logs, I have always

transferred the data from the timecards into the timesheets exactly as written and/or orally

reported to me.  What I mean by paying the employees more than what is reported in the

"on call logs", is that, when an employee reports that they went home for a period of less

than one hour before servicing the next customer, I frequently pay them for their time at home in addition to their time responding to calls.  For example, when an employee reports that he was away from his home from 11:00 A.M. until 12:00 P.M. responding to a call for one customer and then went out again from 12:30 P.M. until 2:00 P.M. to respond to another customer, I will pay that employee for three full hours rather than only paying him for 2.5 hours.  Thus, while I have never intentionally reduced an employee's "on call" time as suggested by the plaintiff, I have frequently increased the time for which he is paid to compensate him for the entire "on call" period, inclusive of the time he is at home, if there is not a significant gap in time between calls.

17.    I cannot recall off the top of my head any one occasion that an employee has ever complained to me that I made a mistake in inputting their time into the computer and I also do not recall any occasion where an employee has ever told me that they thought they were not compensated for all "on call" time worked in his or her paycheck. In fact, I believe that our attorneys have actually interviewed most, if not all, of the installers and rebuilders for both the Queens and Plainview Branches, and have advised me that **every single employee** interviewed told my attorneys in a sworn statement that they have never noticed any discrepancy in their hours or their paycheck. As each employee is provided with an itemized paycheck stub along with their paycheck, it would be easy for an employee to tell if a mistake was made as their hours are broken up into categories for regular time, overtime and "on call" time.

18.    If an employee did ever come to me about a discrepancy in their time

and/or paycheck, I would follow Auto-Chlor's policy set forth in the Employee Handbook for investigating the discrepancy and, if the employee was correct, I would provide the Payroll Administrator with a revised timesheet and ask the Payroll Administrator to have a second check issued to make up for that discrepancy.  See Employee Handbook, p. 28.  If I determined that the employee was properly paid, the handbook requires that the employee next request a meeting with the Regional Manager to resolve the problem.  If the employee is still dissatisfied with the resolution after he or she speaks with the Regional Manager, the employee is then required to prepare a written summary of the issue and deliver the same to the Human Resources person, who will then investigate the employee's claims.

19.     Again, I have never intentionally shorted anyone any time reported and, if I made a mistake in adding up their hours, I would have just had a second check issued or simply added any missed hours to their next paycheck just as I do when an employee fails to get me his "on call" log before payroll had to be sent out.

20.     Despite what is alleged in the complaint, not one of the three plaintiffs have ever complained to me, the Regional Manager, Mike Bugiada, or the Human Resources person about the hours reported in their paycheck.  If they ever made any such complaint, it is mandatory that it be documented in that employee's personnel file.  There is not one notation in these three employees' personnel files that any of them ever made any such complaint.

21.     In any event, I have never, ever knowingly or intentionally shaved time off

of an employee's timecard or "on call" time when inputting the payroll into the computer system.  I have likewise never knowingly or intentionally failed to pay any employee for any overtime he or she may have worked.  I have always simply transferred what is in his or her timecard into the computer, or what the employee told me after speaking with the employee about missing or inconsistent information.  Moreover, this claim makes no sense as there is no incentive for me to alter an employee's timecard as my income is not contingent upon how many hours an employee does or does not work.  To put it more simply, I gain no advantage from shaving an employee's time.

22.     Also despite what is alleged in the Complaint, no one at Auto-Chlor has ever asked me to shave an employee's hours and I have never been told that my employment is dependent upon shaving an employee's hours.  It is absurd for the plaintiffs in this action to claim that Auto-Chlor has any policy that it is trying to cheat its employees out of their time.  I mean, seriously, I frequently *overpay* my employees by paying them for "on call" time when I know they are sitting at home as they reported the same to me, so, why, on Earth, would I thereafter shave time from the employee's "on call" hours?  This claim makes no sense.

23.     Moreover, why would Auto-Chlor care whether an employee is paid for two verses four hours of extra "on call" time in one week?  Auto-Chlor is clearly not a company that is stingy with its employees.  Auto-Chlor pays its employees well over minimum wage even though there is no legal obligation that they do so.  That is a big deal for someone like the installers who are making approximately $20.00 per hour straight time as they are getting $30.00 for every hour worked over forty hours in one

10

week, which often covers all of their "on call" time.  If Auto-Chlor was in the business of being stingy with its employees, they certainly would not pay installers nearly three times the minimum wage for regular time and more than four times the minimum wage for all hours over forty in one week.  Most of Auto-Chlor's installers are making more than $65,000.00 a year plus full benefits having no more than a high school education.

24.     Not only is Auto-Chlor paying its employees premium wages, Auto-Chlor also makes annual contributions into each employee's 401k plan based upon a percentage of his or her annual income without any requirement that the employee match those funds.  In the current economy, many employers no longer offer a 401k, much less put free money into its employees 401k plans to help their employees prepare for retirement.  If Auto-Chlor was trying to short change its employees, you would think that it would (i) fire its employees and hire new employees at the minimum wage rate; (ii) eliminate its benefits package, (iii) stop paying its employees for vacation time, holiday pay and sick pay, and (iv) hire more employees to practically avoid payment of overtime all together.  There are enough people out of work in this recession that Auto-Chlor would have no problem finding a few dozen minimum wage employees to train as installers, rebuilders, route drivers, etc.  Yet, this is not how Auto-Chlor operates.  Indeed, it is because Auto-Chlor is so generous to its employees that some of Auto-Chlor's employees have been with Auto-Chlor for more than two decades.  The plaintiff's claims in this case are not only unsupported by the payroll records, but they make no logical sense considering everything else Auto-Chlor does for its employees that it is not required to do.

*...as to the relevant allegations made by Jose Henry Gonzalez*

25.     As to the specific allegations in the Complaint, it is my understanding that plaintiff, JOSE HENRY GONZALEZ ("Henry"), essentially alleged three things: (i) he was supposedly not paid time and a half for all hours he worked in excess of forty hours in one week; (ii) he was supposedly not paid for his travel time while he was "on call"; and (iii) Auto-Chlor supposedly had some sort of obligation to clean his uniforms or pay him an allowance to do so himself.  It is respectfully submitted that it is clear from the affidavits and payroll records submitted in opposition to plaintiff's motion that none of these claims are supported by actual facts.

26.     A little background about Henry is necessary to understand why he frivolously commenced this action.  Henry was hired by Auto-Chlor to work as an installer on June 4, 2007.  When Henry was hired, he was paid (i) $16.50 per hour for all regular hours he worked up to forty hours in one week and (ii) $24.75 per hour for all hours he worked in excess of forty hours in one week.  Henry did receive two raises during his employment.

About two months in, Henry came to me to ask for a raise as he was going through a rough time financially.  Even though his work performance did not warrant a raise, I was able to get authorization to bump Henry's hourly rate up to $17.00 per hour.  In late December 2009, right around Christmas time, Henry came to me again asking for a raise as he claimed that he could not pay his bills with the money we were paying him.  Again, despite the fact that his work performance did not warrant reward, I was able to get him a raise to $17.50 per hour.  As noted above, as an installer, Henry was required to work "on call" once every six to eight weeks on a rotation schedule with other employees.

27.     While Henry was a hard worker, his work product was poor and he was just not good at his job.  In fact, we frequently had to send someone back to the places he installed equipment to fix his mistakes, which was not good for Auto-Chlor's reputation in the very close-knit restaurant community.  Henry was also not good with customers as his attitude and his quirks would often get in his way.  In fact, we received several complaints from customers about his attitude and the fact that he would expect the customers to feed him when he responded to a service call.  If a customer did not offer to feed Henry or give him a tip for doing his job, he would get annoyed and, sometimes, even demand food.

28.     These complaints became so frequent that one of our salespeople, Ruben Ochoa, actually approached me to speak with Henry as these complaints were hurting Ruben's sales.  As I thought Henry was a hard worker, I would step in and offer to speak with him and often went to bat with my bosses to save his job.  When I would speak with Henry about the customer complaints, he would get very defensive and insulted me.  As such, I had no other choice but to terminate him.  When he got home to his wife, however, she apparently was angry with him for quitting his job as the pay and benefits were so good, and he would ultimately call me shortly thereafter to beg me for his job back.  I have to say that I am really personally angry that Henry is now suing Auto-Chlor based upon nonsense as I stuck my neck out for Henry on more than one occasion and singlehandedly saved his job after I was told to fire him by my supervisors as there were so many complaints from both the salespeople and the customers.  There should be notations in Henry's personnel file about all of the complaints and Ruben can testify

13

about Henry's poor performance as an employee as well.

29.     Henry's "on call" logs were always a problem as well as Henry always reported significantly more time to complete even the most insignificant or trivial of tasks. In fact, Henry consistently reported easily 30% more "on call" time than any other employee, which includes both those more trained than Henry and those with significantly less experience than Henry. There was always something bizarre about the way Henry tracked his "on call" time as well. As I said above, there was an "on call" log that the employees were required to fill out each night they were "on call" and that they were supposed to turn in the following day. Henry would not only hand in the "on call" log, but he would also submit an additional piece of paper that was obviously prepared by someone else as it was not in his handwriting that included his (or whomever prepared it's) attempt at adding up his hours. I would review both documents and input the accurate total number of hours worked "on call" for each day based upon what was in the logs and what was in the CSRs.

30.     In any event, when I would submit my payroll at the end of each period, Henry's hours would frequently raise a red flag and the Payroll Administrator would often call me to inquire whether his hours were accurate as they were so much greater than everyone else's hours. Despite my suspicions that Henry was either padding his hours or was just an unbelievably slow worker, I would always sign off on his hours and tell the Payroll Administrator to just pay him. My attorney has showed me the Payroll Administrator's notations on the payroll records for Henry and it appears that the Payroll Administrator actually made note in her records each time she called me about Henry's

inflated time and noted that I approved his hours every time.  In fact, I believe I was told at one point to let Henry go as a result of his inflated "on call" time viewed in conjunction with all of the complaints as it was my boss' position that Henry was either bad at his job or stealing from the company, neither of which he condoned.  I again, stuck my neck out for Henry, and explained to my boss that Henry was a hard worker even though he was a bit slow and that they should give him another chance.

31.     The final straw for Henry was one morning after he was "on call" the night prior, on or about January 20, 2011.  Henry came to me with a list of demands and advised me that I would need to accede to his demands or fire him so that he could collect unemployment.  Henry demanded that (i) he be exempted from "on call" time as he did not want to work "on call" anymore; (ii) he receive a raise; and (iii) I hire a "helper" to go on installations with him.

32.     I advised Henry that my bosses would not allow me to hire a second employee to help him as he could not handle his job, a position that had always been held by one person without issue.  I also reminded Henry that (a) I had stuck my neck out for him many times in the past when my bosses wanted to fire him and (b) that no one was going to permit me to give him a raise when his personnel file was full of complaints about (i) poor performance, (ii) a bad attitude, (iii) customer complaints, and (iv) several inquiries from payroll about his inflated "on call" time wherein both payroll and my boss suspected that he was fabricating his "on call" time.  I finally advised him that I could not allow him to be exempt from "on call" time as it would not be fair to the other employees, some who were much more senior than Henry, who would have to work "on

call" more frequently as Henry did not want to do his job.

33.     When it became clear to Henry that I was not going to accede to his demands, Henry became quite irate and told me that if I would not give him all of his demands that I would need to fire him so that he could collect unemployment.  I told Henry that I had no intention of firing him, but that he was free to quit if he did not like the terms of his employment, which included a requirement that he work "on call" once every six to eight weeks.  Ron Lacey, who was a route supervisor at the time, was present during this conversation and can corroborate what transpired.  I also believe that there are copious notes in Henry's personnel file about this incident.

34.     In any event, both Ron and I asked Henry to calm down and suggested that he take the rest of the day off to cool down and reconsider his position as, if he quit again, I could not guaranty that I would be allowed to rehire him a second time.  Henry was adamant that I had to make a decision right then and there, and kept repeatedly saying "please fire me so I can collect unemployment."  As Henry would not stop insulting me and refused to go home, I finally relented and told him that he had his wish, he was fired.   As usual, he called me two days later asking me to forgive him for his irrational behavior and to beg me for his job back.  After I spoke with Henry, I called my boss, Mike Bugiada, to advise that Henry had called me to apologize and beg for his job back.  I told Mike that, while his behavior was inexcusable, I would be willing to give him one last shot.  Mike advised me that I was not allowed to rehire him and that I would be "crazy" to even consider it.

35.     After I told Henry that I could not help him, Henry then called Ruben

Ochoa to ask for assistance in getting his job back. When Ruben told Henry that he could not help him, Henry then called Mike Bugiada to ask that Mike please let me hire him back and that he would be an ideal employee if he would just rehire him. Mike likewise advised Henry that he could not help him this time.

36. The reason Henry is suing us now is because he was fired for a second time and, this time, I could not hire him back, plain and simple.

37. As to Henry's first claim in the complaint, Henry *was* paid time and a half for all hours worked in excess of forty hours in one week. Indeed, further ridiculous is Henry's claim that Auto-Chlor has any policy of "refusing to pay overtime compensation to their employees for all of their work in excess of forty (40) hours in one week."

38. As to Henry's second false claim in the complaint, Henry was paid for all "on call" time he reported to Auto-Chlor even though Henry reported "on call" hours in excess of the "on call" time reported by any other employee. In fact, a simple review of Henry's payroll records reveals that it is clear that even the Payroll Administrator questioned the excessive hours that Henry claimed to have worked while "on call", but that I told the Payroll Administrator to pay him anyway. Again, while Henry may be lying, the documents do not.

39. As to Henry's third and final claim in the Complaint, it is respectfully submitted that it is my understanding that Auto-Chlor is not required to wash the uniforms of anyone in Henry's pay grade because, according to the New York State Department of Labor, the uniform allowance is only required where the plaintiff can demonstrate that, not paying the allowance of a few dollars a week, would cause the

employee's wages to fall below minimum wage. As Henry made between $17.00 per hour to as much as $26.25 per hour, it certainly cannot be said that the uniform allowance is applicable to someone of Henry's pay grade. In any event, Aramark cleans our employees' uniforms, not out of legal necessity but because it provides a better presentation when the employees arrive at our customer's place of business in a clean, freshly pressed uniform.

40.     In light of the foregoing, it is respectfully submitted that there is simply no basis in fact to any of the allegations made by Henry in his Complaint other than the fact that AUTO-CHLOR SYSTEM OF NEW YORK, INC. is a California corporation authorized to do business in New York.

### *...as to the relevant allegations made by Richard Keating*

41.     I was really surprised to see that Richard Keating ("Richie") had joined in with Henry's nonsense as I really liked Richie as an employee, but can only surmise that Richie has joined this case as he needs the money since he, sadly, is now on permanent disability.

42.     According to his personnel file, Richie was hired by Auto-Chlor on September 24, 2001 to work as a route driver with an hourly rate of $16.25 per hour plus full benefits and, based upon his position, he would have also made commissions in addition to his regular pay. While I did not work for Auto-Chlor during his first five years of employment, a review of his personnel file reveals that, contrary to what is stated in his affidavit, Richie received numerous raises during his employment.

43.     I did not know Richie as a Route Driver as his position was rebuilder when

I came to work for Auto-Chlor in 2006. After I came to Auto-Chlor, Richie continued to work as a rebuilder--- when he could work ---until he finally officially resigned due to a permanent disability on or about April 12, 2012.

44.     When I say that Richie worked when he could it is because Richie has been battling diabetes for as long as I have known him and spent much of the time we worked together at Auto-Chlor on short-term disability as his diabetes had gotten so bad that they were considering amputation of his foot. Despite the fact that Richie often had to take time off because of his diabetes, I always kept Richie's place open for him to come back to as I felt really bad for Richie and his family as I could imagine what it must be like to watch someone suffer like that. In fact, I was so concerned for Richie's health that I visited him while he was in the hospital and actually gave Richie $30.00-$50.00 from my own pocket after Richie told me that he did not have the money to have his hospital room television turned on. I also visited Richie once at his home while he was on disability. I care about my employees and their well-being, which is why this whole frivolous lawsuit is impacting me so personally.

45.     In any event, as I recall, Richie's diabetes took a severe turn for the worst in 2011 as the diabetes began to take his sight. As a result, I believe that Richie was on short-term disability for most of 2011 and 2012. Richie only worked sporadically when he did work until he decided that he could not work any longer in spring 2012 as he had lost much of his vision. He officially tendered his resignation in writing sometime in around April 2012 and, I believe, he remains on long term disability today.

46.     It is incredibly important to note that, ***nowhere*** in his letter of resignation,

does Richie claim that he was resigning because he felt he was ever cheated on his hours. While there is no indication of the foregoing, in his letter of resignation, Richie **thanks** Auto-Chlor for his ten years of employment.  It is illogical that an employee who felt he had been wronged would write a letter to his employer upon his resignation thanking his employer.

47.     Unlike Henry, Richie always had a good attitude, but his productivity was also below average.  While I hated to write him up because I really liked Richie, unfortunately Richie was written up several times for his poor productivity and work performance.  Richie was also written up numerous times for lying about going on service calls that he never actually went on.  Richie was also stealing from the company by using the company credit card to put gas in his own personal vehicle.

48.     In any event, the Payroll Timesheets and ADP records do not lie, and they prove that Richie was paid for every single hour he reported and actually worked, and they likewise prove that, despite Richie's false claim to the contrary, he did, in fact, receive at least one raise while he worked at Auto-Chlor.  As the documents speak for themselves, other than a need for income, I really do not know why Richie would join this litigation.

*...as to the relevant allegations made by Paul Argento*

49.     Paul Argento ("Paul") was also a surprise more so because he did not work for us very long.  According to his personnel file, Paul only worked for us from July 7, 2008 until May 19, 2009; however, I thought it was even less time than that as Paul was a bad fit from the start.  According to Paul's personnel file, he started out at an hourly rate

20

of $11.00 per hour plus commissions and was increased to $12.00 per hour plus commissions after his probationary period was over.  Paul was hired as a route driver and was a route driver when he left approximately ten months later.

50.     I recall that when I offered Paul the position on the Friday after his interview, he accepted, then failed to show up for his shift on the following Monday as he had accepted another position.  I was really surprised to get his call on Monday, but was even more surprised to get another call from Paul the following week to advise me that he had made a mistake and begged me to hire him with the promise that he would be a very good worker and would be with us for a several years.  Needless to say, I was skeptical, but surmised that things did not work out so well with his other job and decided to give him a chance as I was raised to give people the benefit of the doubt.

51.     Paul had problems from the start as he was lazy and not a good salesman, which caused serious tensions between him and Sergio, the then route supervisor.  Sergio would complain about Paul's sales all the time.  Before Paul took over the route, the hand sales percentage was 16%.  After Paul took over the route, the hand sales percentage dropped by nearly fifty-percent.  The tension between Paul and his supervisor never improved as Paul's hand sales percentage never recovered, with a total average hand sales percentage of 8.77% for the period he worked that route.

52.     Paul also had personality problems with the office manager, who he frequently complained about as he felt that she singled him out too often for his mistakes and that she was constantly nitpicking his mistakes in his paperwork.

53.     As a route driver, Paul had to work "on call" on a rotation, which Paul did

not like as it appeared that he liked his off time to be his off time.  I quickly got the feeling that having to be "on call" once every six to eight weeks was cramping Paul's social schedule and that he was working for a paycheck not to develop a career.  Like I said, I knew that he was not the right fit from the beginning as we cannot leave a customer high and dry in an emergency situation and expect to keep that customer.  In any event, when Paul quit, he was two days into his "on call" week when he called me to tell me that he did not want to do "on call" time anymore and that he was quitting with no advanced notice ---leaving me scrambling to find someone to cover both his route and customer emergencies for the rest of the week.

54.     In both Henry and Richie's affidavits they claim that I questioned them about the excessive time they took to complete tasks while on call.  This claim is mostly true for Henry and partially true for Richie.  I did have to speak with Henry on numerous occasions about his job performance, both during his regular shift and during his "on call" shift.  Henry was often confused about what his job was and I had to spend an exorbitant amount of time re-teaching him about his job.  I am sure that, during my numerous conversations with Henry about his poor work performance, it likely came up that it was taking him too long to complete the tasks asked of him.

55.     I also agree that I questioned Richie about the time it took him to complete his tasks, but he is mistaken that these conversations had anything to do with his "on call" time as my issue with Richie was the result of what I personally observed while watching him during his regular shift.  I would write five jobs for him to complete on the job board, and he would only complete one, which was not acceptable.  I would ask Richie what he

22

had been doing all day and he would have no answer.  My notes in Richie's personnel file reflects that my conversations with Richie were about how slowly he did his job during his regular shift, not during his "on call" time.

56.     It is a bit bizarre that Paul claims in his affidavit that he was a technician as (i) there is no such position at Auto-Chlor and (ii) Paul's *only* position at Auto-Chlor was route driver, which entailed delivering and selling dishwashing chemicals, soap and other cleaning products to the customers on his route.  Paul also bizarrely states that his duties were to "repair and remove dishwashers".  Again, Paul was a route driver, which meant he was essentially a salesman.  Paul was neither qualified to, nor did he ever, install or remove one single dishwasher in the brief period that he worked for Auto-Chlor.

57.     It is also peculiar that Paul would claim to have been "on call" once every four weeks as no one was "on call" once every four weeks unless they volunteered to take someone else's shift, and, Paul in particular, was only "on call" on a handful of occasions during the ten months he was with Auto-Chlor.  In any event, this claim by Paul is likewise easily disproven as his payroll records reveal an entirely different story.  It is also interesting that Paul fails to mention in his affidavit when he discusses his compensation, that, in addition to his regular hourly rate, Paul also received a 13% commission on all additional cleaning chemicals that he sold on his route.

58.     It is finally interesting and speaks volumes about the veracity of Paul's claims when he states in his affidavit that Ron Lacey would supposedly corroborate his bogus claim that Paul (i) was ever shorted for his "on call" time or (ii) ever complained

about his pay to anyone.  Why this is so interesting is due to the fact that Ron Lacey has

agreed to submit an affidavit in opposition this motion wherein he swears under penalty

of perjury that none of the claims made by Paul are true.

SAMUEL VILLANUEVA

Sworn to before me this
30th day of November 2012.

NOTARY PUBLIC

DANIELE D. DE VOE
Notary Public, State of New York
No. 02DE6146226
Qualified in Nassau County
Commission Expires May 15, 2014

23