UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

JOSE HENRY GONZALEZ,
Individually and on behalf of all
others similarly situated,

                         Plaintiff,

                -against-

AUTO-CHLOR SYSTEM OF NEW YORK
CITY, INC., et. al.,

                      Defendants.

-----------------------------------------------------------------X

**AFFIDAVIT OF BRUCE
BERTKAU IN OPPOSITION
TO PLAINTIFF'S MOTION
FOR CONDITIONAL
CERTIFICATION**

Case No. 12-CV-3465 (BMC)

STATE OF NEW JERSEY)
                       SS.:
COUNTY OF BERGEN   )

      BRUCE BERTKAU, being duly sworn, deposes and says:

      1.     I am a sixty year old married man with two children. After graduating high school, I obtained a BA degree in History from Middlebury College.

      2.     I have worked for AUTO-CHLOR SYSTEM OF NEW YORK CITY, INC. (hereinafter "Auto-Chlor") since October 2007, or for a little more than five years. My official title when I was hired was Regional Vice President and I still hold that title today. As Regional Vice President, I oversee all aspects of the franchise in addition to managing its annual sales and profits. The hierarchy of this franchise is that the Regional Manager, the Regional Human Resources person and the Branch Managers for the non-New York

branches (like Connecticut and New Jersey) report directly to me, and I report to the ownership. As the New York based branches go, they report to the Regional Manager, Michael Bugiada, who ultimately reports to me. As I am based primarily out of the branch located in Carlsdadt, New Jersey (New Jersey Branch), I am also intimately aware of what goes on daily in that branch.

3.      As far as the management of the individual branches go, the Branch Managers have guidelines they must follow in running their branch, many of which are contained in the Employee Handbook, but are given some leverage to tailor some individual practices to what works best for their individual branch.

4.      There are essentially seven different positions available at Auto-Chlor on the branch level: (i) branch manager, (ii) salesperson, (iii) installer, (iv) route supervisor, (v) route driver, (vi) rebuilder and (vii) office manager. I guess that it is necessary to state that, when a route driver is in training, he is called a "route trainee". While there may be more than one salesperson and more than one route driver, there is never more than one rebuilder or more than one installer in each branch. It should also be noted that, in the New Jersey Branch, there are two additional positions: (i) operations manager and (ii) accounts receivable.

5.      It is the job of the salesperson to sign up the new business and re-sign the existing customers at the end of their contracts. It is the job of the installer to install the equipment after the contract is signed. It is the job of the route drivers to service the customers on their routes, to provide them with product, to do minor repairs if necessary

and to speak with customers about late payments. The route supervisor oversees the work of the route drivers, covers for an absent driver and, in some branches, works his or her own route. The rebuilder repairs and refurbishes the used equipment. While I am sure that the specific duties of the Office Manager vary from branch-to-branch, it is my understanding that his or her basic duties include answering the phone, dispatching the employees, handling the accounts receivable, invoicing customers, and inputting data into the computer system, such as new customer information and the customer route history from the information contained in the Customer Service Reports (CSRs).

6.      Most employees average a forty to forty-five hour work week for their regular schedule. An employee may work longer if they are still with a customer when their shift technically ends. Route drivers, installers, rebuilders and, in New Jersey, route supervisors are additionally required to work "on call" in addition to their regular shift. The frequency that these employees are "on call" depends upon the practices of the particular branch and the number of route employees that are employed by the branch at any given time.

7.      The branches located in New Jersey, Queens and Plainview are our largest branches, so they will have more "on call" employees. When the Queens, Plainview and New Jersey Branches are fully staffed, Queens has approximately 7, Plainview has approximately 8 and New Jersey has approximately 17 employees who work the "on call" rotation. The branches in the Bronx and Connecticut are smaller branches so they will have fewer route employees and their employees will likely be "on call" more

frequently.  The fact that the route employees in the Bronx and Connecticut are "on call" more frequently does not mean, however, that they work more "on call" hours as they service a smaller customer base.

8.      The employees record their time by punching a timecard for their regular shift and recording their "on call" time by writing their hours either on an "on call" worksheet or on their timecards.  The work the employees do while "on call" is also recorded in the Customer Service Reports (CSR) that each employee is required to prepare for every service call to which they respond.  These CSRs are to be turned into the branch manager or the office manager when the employee reports for his next regularly scheduled shift.

9.      The way the employees are paid is not up to the discretion of the Branch Managers.  As the compensation structure goes, (a) the Branch Managers and the Regional Manager are paid a salary; (b) the installers, rebuilders and office managers are paid an hourly rate; and (c) the salespeople and the route drivers are paid a base hourly rate plus commissions.  In addition to the foregoing, each employee receives benefits, paid vacation time, paid sick time and holiday pay along with a savings account, a 401k plan and profit sharing to which Auto-Chlor contributes each year on the employee's behalf based upon a percentage--- *from 6%-8% on average* ---of the employee's wages without any requirement that the employee contribute matching funds.

10.     Another area in which the Branch Managers do not have discretion is payroll.  Our payroll is done on a schedule that is patterned after our Auto-Chlor Service

Calendar wherein the employees are paid twice a period (on a bi-monthly basis) on a 13 four-week period schedule.  Our payroll runs from Sunday to Saturday.  To ensure that payroll is done timely and efficiently, our Branch Managers are required to input the employees time from the timecards and "log sheets" into a Payroll Timesheet.  The Payroll Timesheet is a form spreadsheet filled out by each branch that (a) itemizes the number of regular shift and "on call" hours worked daily by each employee for the entire payperiod, and (b) also indicates any holiday, sick or vacation pay the employee used that week.

11.     Once the Payroll Timesheet is reviewed for accuracy, it must then be sent to the Payroll Administrator the Monday morning immediately following the last day of the payroll period.  For the Queens and Plainview Branches, as they are so large, the Branch Managers first send the payroll to the Regional Manager for review, and then it goes to the Payroll Administator.  Our Payroll Administrator collects the Payroll Timesheets from the branches, reviews the payroll once more to make sure that there is nothing out of the ordinary, and then forwards the payroll to Automatic Data Processing Company (ADP) so that our payroll can be prepared in accordance with the law.

12.     The employees receive their paychecks, along with a detailed paycheck stub itemizing the hours worked and the applicable rate of pay, every two weeks.  More particularly, the paycheck stub is broken down to include (i) the number of regular hours worked during the regular shift; (ii) the number of overtime hours worked during the regular shift; (iii) the number of regular hours worked during their "on call" shift; (iv) the

number of overtime "on call" hours they worked; and (v) the applicable pay rate for each

of the foregoing hours worked.  In addition to the foregoing, the paycheck stub also

reflects any deductions made, both the legally mandatory and the voluntary deductions

for such things as a 401k contribution, as well as any commissions earned by the

salespeople and route drivers.

13.     Employees are always paid time and a half for all hours worked in excess

of forty hours in one week.  It should be noted that the overtime pay for the route drivers

is paid at a premium rate as we factor in their commissions for the week when we do the

payroll so that they are paid overtime based upon their regular hourly rate plus the

average of their sales.  Paying the employees time and a half for all hours worked over

forty in one week is also not up to the discretion of the Branch Managers as it is required

by both state and federal law.  In any event, the Branch Managers really have no control

over whether an employee is paid time and a half for all hours worked over forty as the

Branch Managers simply report the hours worked to ADP and we pay ADP to prepare the

actual payroll in accordance with the law.

14.     In the five years I have worked for Auto-Chlor, I have never told my branch

managers not to pay any employee overtime pay for hours worked in excess of forty in

one week.  I have also never told my branch managers to "reduce" or "short" any

employee hours reported for "on call" time.  I have likewise never heard any branch

manager say that they were intentionally shorting any employee any overtime pay or any

"on call" pay.  If I did hear anything of the sort, I would not have permitted it to happen

as we have no reason not to pay employees for the time that they work.

15.     That stated, it should be noted that no one is perfect and people can make mistakes or typographical errors when inputting data.  As such, I do recall, on probably one or two occasions, I have heard or overheard that the person who input the payroll in New Jersey missed an hour or two.  I also heard or overheard that the issue was promptly remedied by investigating the issue, confirming that there was a typo on the payroll and that another check was issued to the employee.  This is the protocol set forth in the Employee Handbook and this is the proper protocol to be followed by the employees and the management.  If there is a mistake, it is to be investigated and promptly remedied.  Outside of the foregoing, I am not aware of any other incident where there was a typo in the payroll, I am not aware of any other employee stating that anyone in this or any other branch input his or her time wrong, and I am not aware of any such complaint to HR.

16.     More particularly, Auto-Chlor has a very clear protocol for an employee to lodge a complaint that is set forth in writing in our Employee Handbook.  This protocol requires that any employee who thinks that he has been wronged to (1) speak with the branch manager; (2) if he is not satisfied after speaking with the branch manager, he must then speak with the Regional Manager, and (3) if he is still not satisfied, he is required to make a formal written complaint and to send that complaint to the HR person for a full investigation, at which point I would become involved.

17.     In the five years I have been with Auto-Chlor, I am not aware of any employee from any branch ever complaining that he or she thought the Branch Manager

was *intentionally* shorting his or her hours.  I have likewise never heard any employee complain that he or she felt that the Branch Manager was *intentionally* not paying him or her overtime for every hour worked in excess of forty hours worked in one week.  While I am primarily in the New Jersey Branch, I frequently visit the other branches and have never heard any such complaint.

18.    I also have worked with the branch manager at the Queens Branch and the Regional Manager, who oversees that branch, for five years now and do not believe that either one of them would ever intentionally short an employee's hours.  It just does not add up.  Not only is it not in either of their personalities to do something like that, but it further makes no sense as their compensation is not tied to the whether they pay their employees for all hours worked or not.

19.    As to the specific claims made by the three individuals who submitted affidavits in support of this motion, I am familiar with JOSE HENRY GONZALEZ ("Henry") and Richard Keating ("Richie"), but am only vaguely familiar with Paul Argento as he worked for us so briefly so long ago.

20.    I am very familiar with Henry as Henry was often the topic of discussion in my meetings with the Queens Branch Manager, Sam Villanueva, and the Regional Manager, Michael Bugiada.  The issue with Henry is that he was, quite frankly, not very good at his job.  He never understood what he needed to do, he never remembered the proper protocal within his branch, there were constant complaints about his poor performance and the Branch Manager was spending an enormous amount of time

explaining to Henry how to do his job.  To put it more simply, I was advised that Henry could not work independently, required constant management and oversight, there was never any improvement in his work performance and it appeared as though he was just "not getting it".

21.     Sam, Michael and I would often discuss what to do with Henry due to the numerous complaints about his performance.  It was my opinion based upon what I had heard about Henry's poor work performance that Sam needed to fire Henry and replace him with someone who could actually do the job.  While it was the opinion of both Michael and I that Henry should be fired, Sam is not the type of person who gives up on people quickly and he would often say that he was going to continue to try to motivate Henry to improve his performance.  Sam would then spend an emormous amount of time with Henry, yet again, telling Henry that he needed to look at the job board every day when he got in, telling Henry what tools he needed to bring with him on an installation and what needed to be done when he got there.  I do not know if it was a langauge barrier or what, but Henry just never got it.  Sam would tell me that Henry would just come in, look at the board and not know what to do or what equipment he needed to use to do his job.

22.     Sam is the type of person who has a really big heart which is great in a person and sometimes good in a manager, but the biggest criticism Sam has had over the years is that he keeps people on too long with the belief that everyone has the propensity to change and improve.  While I also try to look for the good in all people, I likewise

have no problem cutting someone loose after it becomes apparent that they are just never going to get it. I told Sam on more than one occasion that he needed to fire Henry because he just was not getting it.

23.     As will be discussed in full detail below, I am also familiar with Richie as Richie was another employee who Sam kept on too long as he felt sorry for Richie. It was not that Richie not capable of doing things, it was just that he did things so painstakingly slowly, which was likely due to physical restrictions placed upon Richie due to his health issues. Sam, Mike and I also had several conversations about what to do about Richie as we had a moral issue as none of us wanted to fire Richie because he could no longer do his job, but the business was definitely being hurt as a result. This appears to be why his position was changed from Route Driver to Rebuilder in 2006 as he simply could not service the customers on his route anymore as he was not physically capable of doing so.

24.     Changing his position did not make anything better, though, as Richie still had to go on location from time-to-time and would tell Sam that his health had depreciated so much that he could not see what he was doing. This caused another moral dilemma for us because it was difficult for us to keep sending this guy out on the road in a company vehicle when he is telling us that his physical condition had worsened so much that he could not see. On the other hand, we knew that we really did not have any other position for him and did not want a lawsuit on our hands for not making all reasonable accommodations. So, we kept him on for years longer than we should have.

While I hate to say this, Richie being out a lot on short term disability in 2010-2011 and then permanent disability in 2012 was a blessing in disguise as we did not want to have to fire him, but we also could not, in good conscience, continue to send someone out on the road in a company vehicle who was telling us that he could not see.

25.     As noted above, I have no specific recollection relating to Paul Argento other than that I am aware of the fact that he worked for us briefly several years ago.

*...as to the specific claims made by Jose Henry Gonzales*

26.     With regard to the specific allegations made in JOSE HENRY GONZALEZ'S ("Henry's") Complaint, it is my understanding that Henry makes the following claims in his Complaint: (i) he claims that he was supposedly not paid time and a half for all hours worked in excess of forty in one week; (ii) he claims that Auto-Chlor supposedly did not compensate employees for their travel time while "on call", and (iii) he claims that Auto-Chlor supposedly had an obligation to clean the employees' uniforms and failed to do so.

27.     Henry was always paid time and a half for all hours worked in excess of forty hours in one week and I am certain that this is reflected on the payroll records as ADP, who is an expert in preparing payroll, would not likely have made such a mistake when preparing the payroll.  In any event, this is easily proven by comparing what is in the Payroll Timesheet with what is in the ADP records.  In any event, his claim that Auto-Chlor has a policy of not paying its employees time and a half for all hours worked in excess of forty in one week is not true.  Auto-Chlor has no such policy and I do not

know where Henry thinks he ever heard or read about any such policy. Nevertheless, the Payroll Timesheets and ADP records will speak for themselves.

28.     As to Henry's second claim, everyone knows that "on call" compensation starts from the time you leave your house until the time you return home. Just ask any employee and they will tell you that they are compensated from door-to-door. As it appears that Henry has abandoned this claim in his affidavit, I will not get into the absurdity of this claim any further.

29.     With regard to Henry's claim that he was entitled to a "uniform allowance", I am assuming this was something that was thrown into the complaint by the lawyer as I am sure that Henry, who does not speak English well, did not tell his lawyer that he was entitled to any "uniform allowance". In any event, Henry is not entitled to any uniform allowance, as his lawyer should have advised him, because Henry makes too much money. I have read the uniform allowance statute, I have read the official opinions of the New York State Department of Labor and I have also spoken with my lawyer in this regard, and it is clear that the uniform allowance applies only to minimum wage employees, which Henry certainly was not. In any event, for the purpose of this motion seeking class certification as it pertains to other employees, our uniforms are cleaned by Aramark.

30.     As to the individual claims made by Henry in his affidavit, it should be noted at the onset that Henry was not employed by Auto-Chlor as a "technician" as no such position exists. Henry worked for Auto-Chlor as an installer, which meant it was

his job to install commercial dishwashers.

31.     Henry also claims in paragraph 4 of his affidavit that he thinks there were at least 20 employees in Queens and 10 in Plainview who performed the same duties as him. This is also a lie. Each branch only employs one installer, which means that Henry would have been the only installer at Queens during the period that he worked there and there would have been exactly one installer employed in Plainview at this time.  None of the other employees named by Henry were installers and none of those employees had the same duties as Henry.

32.     Henry also claims that these same people were paid the same hourly rate that he was paid, which is not only untrue but is also suspicious as he would have no way of knowing what other people were paid.  More particularly, Henry was not paid at the same rate as Paul, John Carlisimo, Cesar or John Colilo as they were not installers, but rather were route drivers.  Route drivers are quasi-salesmen and have a completely different set of duties and a completely different pay scale that is based upon an hourly rate plus commissions.  Thus, none of the employees who Henry named were paid the same as Henry and, had he actually spoken to them about what they were paid, he would have known that.  I also do not know how Henry can say that he knows how anyone in the New Jersey or Plainview Branches were paid because he had no reason to interact with other branch locations that serviced different territories.

33.     It is also not true that Henry "almost never took lunch breaks" as this is one of the company policies that Auto-Chlor strongly enforces.  The employees are required

to take lunch and will be written up if they fail to do so absent extraordinary circumstances. This policy is not only contained in our Employee Handbook, but has also been reiterated to the employees on numerous occasions both orally and in writing. If Henry was not taking lunch, again, I would have known about it as he would have been written up and potentially fired for violating company policy.

34.     As stated above, despite Henry's false claims to the contrary in his Affidavit, it is not feasible that Henry worked "on call" *once a month every month*. I do agree with Henry's admission in his affidavit that he was paid "on call" time from the time he left his home until the time he returned home, which is the opposite of what he says in his complaint.

35.     It appears that his "new claim" is that someone was supposedly reducing the number of hours he reported, which is also not true. There is certainly no policy at Auto-Chlor of "intentionally reducing employee's" "on call" time. Moreover, Henry's claim that he was cut 5-10 hours of "on call" time each week just makes no sense as he probably did not regularly work much more than 10-15 hours in total for the average "on call" week. So he is essentially claiming that we paid him no "on call" time at all, which again will be disproven by the ADP records and the Payroll Timesheets.

36.     Similarly, there is also no way Henry worked "on call" once a month every single month as he worked in the Queens Branch, which is one of the bigger branches that has approximately five route drivers, two route trainees, one installer and one rebuilder when they are fully staffed. While I could believe that Henry worked on call

once a month if he worked in the Bronx or Connecticut, it is just not possible that Henry regularly worked "on call" once a month in Queens.

37.     Furthermore, there is no way a guy who claims he is being shorted 5-10 hours "on call" time every single month was going to stay with us for more than three years without saying anything.  I know that he never complained to me about his hours being shorted and I am pretty positive that he never said anything to the HR person, the Branch Manager or the Regional Manager because this is something that they would have reported back to me and there would have been a notation in his personnel file.

38.     I also do not believe that Henry ever complained to his manager that he thought his hours were being intentionally cut as this is something his manager would have spoken to me and/or the Regional Manager about.  I also do not believe this to be the case as there are several other people that he could have spoken to if he really believed this to be true.  He could have spoken with the Route Supervisor, his Branch Manager, the Regional Manager, the HR person or he could have spoken to me.  He has certainly never spoken with me about this and there is no indication in his personnel file that he has ever spoken with anyone else about this, which leads me to believe that it never happened.  There is a clear written policy as to the steps to be taken when an employee thinks that he was wronged and Henry clearly did not take those steps if he really did believe this to be true.

39.     As to Henry's false claims in paragraph 18, there have only been two installers who have worked in the New Jersey Branch during the relevant period and I

know that Henry has never spoken with them.  I have likewise never heard any complaints from any of the individuals from the Queens Branch that Henry named in his affidavit that they felt their hours were being "shorted".

40.     It is, again, not true that Auto-Chlor did not pay Henry and all installers in the other branches time and a half for all hours worked in excess of forty hours in one week and this will be easily disproven by comparing the Payroll Timesheets with the ADP records.

41.     Both my attorneys and I have spoken with the HR person, the Branch Managers and the employees after we received the foregoing complaint to investigate the claims made by Henry with regard to his claim that he was supposedly not paid time and a half for all hours over forty in one week as well as his claim regarding supposedly "on call" time deductions, and we have found not one person in any branch that corroborates his story.  In fact, I am pretty sure our attorneys interviewed the "on call" employees from the Plainview and Queens Branches and every single one of them said that they have never had a similar experience to what Henry is claiming.

42.     I also had both my attorneys and the HR person audit Henry's payroll records, and it is my understanding that his payroll records reflect both overtime payment for all hours over forty in one week and also the appropriate amount of "on call" time.  As such, it is respectfully submitted that Henry was paid time and a half for all hours worked over forty hours in one week, and Henry was paid, on average, as much if not more "on call" time than most other employees.  Thus, the documents also do not support

Henry's claims as there is *no way* he was shorted 5-10 hours of "on call" time every time he worked "on call" when he was, more often than not, paid more "on call" time than anyone else.

43.     Upon review of Henry's personnel file, it appears that Henry's file supports the many complaints I heard from Sam about his performance.  Henry  was written-up on multiple occasions for (i) not doing his job correctly, (ii) guessing rather than properly performing the work to be formed within the level of skill that is expected from a professional company, (iii) failing to timely complete his paperwork, (iv) having a bad attitude and arguing with customers; (v) failing to make installation appointments set by the office; (vi) improperly telling customers that he would be returning on dates that he was scheduled to be elsewhere; and (vii) insubordination by (a) completely disregarding the directives of his supervisor, (b) advising his supervisor that he would not be completing the work assigned as he had company at his house who he needed to entertain, and (c) he did not have to listen to his supervisor's directive as to the work to be completed during the day as he felt that his supervisor did not know anything about his job.  Nowhere in his personnel file is there any notation that Henry has ever complained that he felt he was not compensated for his time.

44.     In light of the foregoing, it is respectfully submitted that Henry's claims herein are not supported by the documents and are not corroborated by the affidavits of any disinterested parties.  As such, it is respectfully requested that Henry's application for conditional class certification be, in all respects, denied, and for such other, further and

different relief as may be just, proper and equitable under the circumstances.

### ...as to the specific claims made by Richard Keating

45.     According to his personnel file, Richard Keating ("Richie") worked for Auto-Chlor at the Queens Branch from September 24, 2001 until he resigned on April 12, 2012. As I have only worked for Auto-Chlor since October 2007, I can only speak about what I have experienced since my arrival and what is reflected in our business records.

46.     According to Richie's personnel file, Richie started out at Auto-Chlor as a Route Driver in 2001.  As noted above, Richie's duties as a Route Driver were to service the customers on his route by providing them with product, by doing minor repairs to the equipment, and to speak with customers about payment defaults.

47.     Richie's claim that he was paid $17.00 from the time he began with Auto-Chlor in 2001 until the time Auto-Chlor in 2012 is simply not true.  It appears from his personnel file that Richie was compensated $16.25 per hour when he was first re-hired by Auto-Chlor in or about September 2001.  It also appears that Richie's compensation changed to $9.50 per hour plus commissions effective 12/13/01.  It then appears that Richie's received a raise effective 1/14/02 to $10.47 per hour plus commissions.  It next appears that Richie received a reduction in pay effective 7/15/02 so that he was paid $9.53 per hour plus commissions.  It appears that Richie was promoted to Operations Manager on 11/4/02 and received a big raise to $17.79 per hour flat rate.  Richie received another raise on 12/29/03 to $18.32 per hour plus "manager bonus".  It appears that Richie was demoted back to Route Driver on December 27, 2004, and was paid $13.13

per hour plus bonus and a 4% commission on dishwasher chemicals and a 12% commission on hand sales.  On February 10, 2006, it appears that he received a reduction in pay to $11.13 per hour plus commissions as a Route Driver.  Finally, on December 4, 2006, Richie was apparently demoted once more to Rebuilder as he could no longer service his route, and his pay changed to a non-commissioned position with a rate of pay of $17.00 per hour. [Note: the record incorrectly states his title was changed to "installer", but his payroll records accurately reflect that his position was "rebuilder" from 2006-2012]  In light of the foregoing, it is respectfully submitted that it could not be farther from the truth that Richie's salary remained stagnant at $17.00 per hour for the entire time he worked for Auto-Chlor as it is clear based upon the contents of Richie's personnel file that Richie received both increases and decreases in wages dependent upon the position he held and whether he received commissions.

48.     While I am aware that the Queens Branch Manager, Sam Villanueva, has submitted an affidavit herein stating that Richie was a hard worker and a nice guy, after reviewing Richie's personnel file, I think that the Branch Manager is being far too kind in describing Richie's work performance while at Auto-Chlor.  I know that Sam has a big heart and that he sympathizes with Richie's battle with diabetes, but, truth be told, Richie's file is full of write-ups for insubordination, lying, falsifying company documents and repeatedly failing to show up for scheduled shifts.  In fact, Richie's personnel file is a hundred pages long and a vast majority of its contents are write-ups for lying.

49.     Quite frankly, I do not know how Richie was not fired with all of these

write-ups, some of which he blatantly lied about going on a service call, which he later

was forced to admit as the customer would complain that no one ever showed up and

another employee would confirm that the work had not been done.  While I have not

personally reviewed the payroll documents, I would venture to guess that any

discrepancy between the records and any worksheet Richie has is not the result of any

malicious scheme to cheat Richie out of hours, but rather arose from the fact that we

discovered that Richie had not actually done the service call that he reported.

50.    More particularly, Richie's personnel file includes the following write-ups:

(1) 7/27/11: Richie was suspended for three days without pay for lying
about going on several services calls that he never did and falsifying
corporate documents.  More specifically, on 6/2/11, 6/24/11 and
7/26/11, Richie reported in his service logs that he had performed
certain work that he had never actually performed.  When questioned
about this, he claimed that he did not perform the work because the
problem supposedly did not exist.  When another employee investigated
further and confirmed that the problem did, in fact, exist, Richie was
told to go back down to the customer's location to fix the problem.
Richie falsely reported in his log again at the end of June that the
problem had been fixed; yet, when the route person followed up with
the customer he discovered that Richie had not fixed the problem as he
claimed.  When confronted with this lie, Richie lied yet again, claiming
that he supposedly did not do the work as it required a plumber.  The
branch manager and another employee then went down to the
customer's location and were able to remedy the problem within 12
minutes.

(2) 6/30/11: Richie was issued a final written warning about lying in his
service records about service calls he claimed to have performed, but
did not.  More particularly, on 6/28/11, Richie reported to the branch
manager that he was in front of Best Pizza and that he was going to
service the account.  Richie later submitted a service log claiming to
have serviced the customer.  On 6/29/11, the customer called upset
because no one came to his restaurant on the day prior to fix his
dispenser.  When confronted, Richie claimed that he left the place

without going in, but gave no reason for why he claimed to have completed the work. Richie was warned that, if this continued to happen, he would be fired.

(3) 10/4/10: Richie was written up for poor performance, disorganization and lying about completing work in his service logs that were not done. More particularly, Richie reported that he had repaired a laundry dispenser for a customer. Several days later, the salesman complained that no work had been done as the laundry dispenser was still not working. Richie was likewise sent to two other customers and reported that the work had been completed. Both of these customers called the branch a few days later to complain that the work had not been done. Richie also lied that he did not have the tools to complete the work, but another employee found the tools he claimed he did not have in his truck. There were other issues in this write up relating to Richie's cleanliness and disorganization as well.

(4) 9/10/10: Richie was issued a "verbal/written warning" with regard to Richie's inability to complete his work during his regular shift within a reasonable time period. The purpose of this warning was to advise Richie that his productivity needed to improve greatly as he was given several tasks to do over the course of a regular work day and he was only able to complete one task.

(5) 1/29/10: Richie was written up and suspended for insubordination after he failed to show up for a regularly scheduled shift even after his manager told him that he could not take the day off.

(6) 11/24/09: Richie was written up as he was instructed to go to a customer's location. Richie claimed that the location was closed and was instructed to return to the shop to leave a note for the "on call" person to return to the location later in the evening. Richie did not return to the shop to leave a note for the "on call" person, and never told his manager that he failed to complete this task. Thus, the "on call" person never returned to the location.

(7) 12/16/08: Richie was written up for repeatedly being late, for leaving the shop in disarray, and for disregarding or amending the directions given to him by the branch manager.

(8) 7/18/08: Richie was written up and suspended for two days for failing to show up for a scheduled shift. When confronted, Richie lied and said

that the operations manager had supposedly approved the time off.
When questioned, the operations manager stated that he had not
authorized the time off, but rather told Richie that he needed to clear it
with Sam. After Richie was advised that no one authorized the day off,
Richie volunteered to work on the following Sunday to make up the
time, but no work was completed.

51.    Richie was also issued a verbal warning and/or write-up on 2/21/08,

11/18/08, 11/21/08, 11/25/08, 11/24/09, 1/14/10, 1/28/10, 1/29/10, 9/22/10, 9/23/10,

4/26/11, 5/9/11, 5/25/11, 6/24/11, 6/29/11 and 10/6/11. The vast majority of these write-

ups and/or verbal warnings the result of Richie falsely reporting in his logs that he had

serviced a customer that he did not actually service.

52.    In addition thereto, in his 2007 performance evaluation, Richie was told

that he needed to reduce the number of absences from work as he frequently did not show

up on Mondays or Fridays for work and did not get prior approval for these days off.

Richie was also advised that he needs to complete his paperwork and to turn it in on time.

53.    It appears from Richie's personnel file that he first went out on short-term

disability on 2/20/10 with the expectation that he would return to work on 5/24/10.

Richie then filed for long-term disability (the first time) on 5/21/10. Richie filed for

long-term disability on 10/4/11 (the second time) and did not thereafter return to work. I

think that it is very telling in this case that, when Richie tendered his resignation in

writing on 4/12/12, he thanked Auto-Chlor for sticking with him for a decade and made

no mention of the fact that he thought he was ever cheated any hours.

54.    In any event, nowhere in Richie's personnel file does it indicate that he ever

complained about not being paid the hours that he worked. In fact, quite to the contrary,

his personnel file reveals that Richie was likely paid for work that he did not actually do.

55.     As to the specific claims of Richie in his Affidavit, I again note that Richie states that he worked as a "technician", but no such position exists at Auto-Chlor.  It appears from his personnel file that he worked as a Route Driver until he was no longer physically able to do so and thereafter worked as a Rebuilder until he resigned.  In any event, it does appear that Richie worked for Auto-Chlor from 2001 until October 2011, but it also appears that he did not work much in 2010 or 2011 as he was off on short and long term disability much of this time.

56.     While Richie states that his primary responsibility was to install and repair dish machines, that statement is only partially correct.  From 2001 until 2006, Richie was a Route Driver, so his responsibility was to service the customers on his route, sell them cleaning products and do some minor repairs while at a customer's location.  In 2006, he worked as a Rebuilder, which means that his job is to rebuild, refurbish and repair dishwashing equipment.  I do not believe that Richie ever worked as an installer, so his job duties would not include the installation of the dish machines.

57.     In paragraph 4, Richie claims that Henry and someone named "Abraham" performed the same duties as Richie while he worked there, which is not true and not possible.  While I am not familiar with anyone named "Abraham" being employed at the Queens Branch while Richie was there, I cannot speak with authority about what happened more than five years ago as I was not with Auto-Chlor before 2007.  As far as Henry goes, Henry was an installer and was never a rebuilder or a route driver.  Thus, it

would be incorrect to state that Henry had the same job duties as Richie. This would also be impossible as we only have one rebuilder employed at each branch at any one time.

58.     It is also not true that Richie was paid $17.00 per hour the entire time he worked for Auto-Chlor. This is likewise impossible as he worked as a Route Driver first, which is a position that yields a base hourly rate plus commissions based upon his hand sales. Thus, even if his base salary was always $17.00 per hour, not that I am saying it was, he would have also been paid commissions when he was a Route Driver, or until 2006.

59.     While it is probably correct that Richie's schedule was from 8:00 A.M. to 5:00 P.M., it is **not** correct that he "never took breaks" as Auto-Chlor has a strict requirement that employees must take breaks. I also find it implausible that a person with diabetes would work nine hours straight without taking a meal break.

60.     Richie was never regularly "on call" one week a month as that was not possible. Richie was also not "on call" very much for the last two years he worked for Auto-Chlor as he was perpetually on disability. When he was not on disability, Richie likely worked "on call", on average, once every six to eight weeks based upon the number of other "on call" employees who shared the rotation with him.

61.     I agree with Richie that it was Auto-Chlor's policy that this "on call" time was to be compensated from when he left his home until he returned home. I also agree that using the "on call" logbook was one way to track his "on call" time in the Queens Branch and that he was also required to complete a CSR for each service call performed

while he was "on call".  I also agree that he was supposed to turn in his CSRs and "on call" log during his next regularly scheduled shift.  It appears, however, from his personnel file, that Richie had problems getting his paperwork completed and turned in on time.

62.     I disagree that anyone was regularly reducing Richie's total hours for any reason, and would like to know what evidence Richie has that his ever happened.  As Richie turned in his sheets to his manager before payroll was performed and claims in his affidavit to have thereafter compared some sort of "worksheet" with his paycheck to confirm his suspicions that his hours were supposedly being cut, then I am sure that Richie kept these "worksheets" so that he could produce them now as evidence that his hours were being cut.  I am perplexed as to why, if he thought he was being cheated, he has not produced these "worksheets" to this Court as proof positive that he was not paid properly.  We could easily compare his "worksheets" that told him his hours were being shorted, if any such document actually existed, with the Payroll Timesheets or the ADP records.  The fact that no such evidence was submitted in support of this motion speaks volumes as to the veracity of Richie's claims.

63.     Actually, I have this same question for all of these people.  If they swear under penalty of perjury that (i) they turned in their logs to the Branch Manager the next day after they worked, (ii) the Branch Manager then prepared the payroll, supposedly shorting them hours, and (iii) they know this because they compared their paycheck stub with some "worksheet" that proves they were shorted, then they certainly would have

retained this unequivocal evidence to produce to this Court, but I see nothing.
Apparently, either these "worksheets" that proved hour shorting with regard to Paul,
Henry and Richie do not exist and they were lying in their affidavit, or they are
withholding this evidence as it would prove that they are lying.

64.     While I agree that Richie was entitled to, and was paid, premium overtime
when he was a Route Driver as this was a commissioned position, I disagree that Richie
was entitled to premium overtime when he worked as Rebuilder as this was not a
commissioned position.  That stated, Richie was always paid time and a half based upon
his regular hourly rate for all hours worked in excess of forty in one week as a Rebuilder.

65.     As to what is set forth in Paragraph 15, there is no such position as
"technician" at Auto-Chlor.  Henry *may* have been compensated a similar rate of pay as
Richie when Richie worked as a Rebuilder.  I am not aware of any conversation between
Richie and anyone else about their compensation, but I do know that another employee
that worked with Richie has confirmed that he never had any conversation with Richie
about his pay and that he was always paid for all "on call" hours worked.

66.     I am not aware of anyone ever intentionally shorting Richie any "on call"
hours.  It is possible, however, based upon what I read in Richie's personnel file, that
Richie was not paid for the calls he lied about going on while he was on call after an
investigation revealed that he had lied, which is possibly why his numbers do not match
his paycheck. That stated, I have no reason to believe that even this ever happened as I
have recently learned that this particular Branch Manager is a bit too generous with his

employees as this audit has so far revealed that Sam would often pay them for *more* "on call" time than was reported by the employee if the break time in between calls was less than one hour.

67.    While I submit, once again, that there is no position of "technician" at Auto-Chlor, it is **not true** that Auto-Chlor failed or refused to pay Richie, or anyone for that matter, time and a half for all hours worked in excess of forty in one week.  Quite to the contrary, the records reveal that Auto-Chlor paid did, in fact, pay Richie, and everyone else, time and a half for all overtime worked.

### *...as to the specific claims made by Paul in his Affidavit*

68.    According to Paul Argento's personnel file, he worked for Auto-Chlor as a route sales driver from July 7, 2008 until May 19, 2009.

69.    Just as I only vaguely remember Paul, nothing in Paul's personnel file jogs my memory about him.  Paul's personnel file indicates that he was written up for cursing out and badgering the Office Manager on February 9, 2009 at 3:30 P.M. because he did not want to respond to a service call so late in the day as it may impede his ability to go home right at 5:00 P.M.  Paul then apparently called his Branch Manager to ask that the service call go to someone else as he did not want to go out to service a customer so late in the day.  The Branch Manager apparently reminded Paul that his shift was from 8:00 A.M. until 5:00 P.M., and that it was his job to service customers during those hours.  It also appears from the Branch Manager's notes that this was not the first time that Paul cursed out the Office Manager or complained about having to go out on a service call in

the afternoon.  Paul was also written up again shortly before he quit for failing to show up for work on April 23, 2009 and May 4-8, 2009.

70.    As to the specific allegations in Paul's affidavit, there was and is no "technician" position at Auto-Chlor. Paul worked as a Route Driver during the brief period he worked for Auto-Chlor.  It is true that Ron Lacey was also a Route Driver during this time.  It is true that Paul was paid an hourly rate during his employment, but he fails to mention that he was also paid 13% commissions on his hand sales in addition to his regular hourly rate.  It is also probably true that Paul's regular shift was probably from 8:00 A.M. until 5:00 P.M. as I see a notation to that effect in his personnel file.  It is not true that Paul "rarely ever took breaks" as that would have been a violation of a strict company policy.

71.    It is also not true that Paul worked "on call" once every four weeks as that would be impossible.  It is ironic that Paul names at least five other people who worked the "on call" rotation with him, and then claims to have worked "on call" once a month every month. Just doing the math, including Paul, that would make six people sharing the "on call" rotation, which means that his statement in paragraph 4 about those who he claims are "similarly situated" contradicts his claim in paragraph 7 that he supposedly worked "on call" once a month.

72.    I agree with Paul that it was his responsibility to record his "on call" time and that he was compensated for his "on call" time from when he left his house until when he returned home.  I also agree that Paul was required to turn in his paperwork,

inclusive of his hours and his CSRs for every service call the very next regular workday.

73.     For the same reasons that I set forth above, I do not believe that anyone was reducing Paul's hours and think it is suspect that he claims in paragraph 11 and 12 that he supposedly maintained a calculation of his "on call" hours and compared that calculation with what was put on his paycheck up to two weeks later to confirm that he was supposedly shorted hours, but has not produced any such calculation in support of this motion.

74.     Paul also claims that he complained on "multiple occasions" about supposedly being shorted for his "on call" hours, but his personnel file is devoid of any such complaint and he certainly never made any such complaint to me.

75.     Paul's affidavit borders on the side of comical when Paul claims that he was supposedly shorted 5-10 hours of "on call" time each week.  That would mean that he was essentially not paid for any "on call" time at all since the average employee reports 7-15 hours a week when they are "on call".  The Payroll Timesheets and ADP Records just do not support this claim.

76.     Paul also claims in paragraphs 15 and 17 that he was supposedly not paid time and a half for 2 or more hours each week that he worked in excess of 40 hours in one week, which is a complete lie and easily disproven as well by the Payroll Timesheets and ADP records.

77.     The most interesting thing in Paul's affidavit is that he names Ron Lacey as someone who has supposedly told Paul that he was likewise shorted hours and identifies

Ron Lacey as a potential witness in this case. I have been advised that our lawyers have taken the statement of Ron Lacey, who worked with all three of these individuals, and Ron has said that nothing stated in Paul's affidavit is true. I respectfully refer this Honorable Court to the Affidavit of Ron Lacey in response to the claims made by Paul in paragraphs 4 and 16 of his affidavit.

## CONCLUSION

78.     In light of the foregoing, it is respectfully submitted that the plaintiff herein has not submitted credible proof that there are other employees similarly situated to them warranting this Court's grant of conditional class certification. It appears that plaintiff and his attorneys are going on a fishing expedition here wherein they hope to find something by digging into Auto-Chlor's records.

79.     It is respectfully submitted that granting class certification would irreparably harm the defendant herein as it would cause the defendant immense financial hardship in defending this fishing expedition, it would potentially cost the defendant a tremendous amount of business as it would necessarily result in the divulgence of defendant's client lists and, potentially, the price rate plan given to each client, and would upset the daily function of Auto-Chlor's business as it would require its employees to expend a tremendous amount of time sorting documents and appearing for depositions in an action that is, quite candidly, frivolous.

80.     As such, the defendant respectfully requests that plaintiff's motion, in all respects, be denied, plus such other, further and different relief as may seem just proper and equitable under the circumstances.

BRUCE BERTKAU

Sworn to before me this
___ day of December 2012.

NOTARY PUBLIC
State of New Jersey
My comm. Exp. May 01, 2015