UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JOSE HENRY GONZALEZ,
Individually and on behalf of all
others similarly situated,

                        Plaintiff,

-against-

AUTO-CHLOR SYSTEM OF NEW
YORK CITY, INC., et. al.,

                        Defendants.
------------------------------------------------------------X

**AFFIDAVIT OF ROBERT SMITH IN OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION**

Case No. 12-CV-3465 (BMC)

STATE OF NEW YORK  )
                                 SS.:
COUNTY OF NASSAU  )

      ROBERT SMITH, being duly sworn, deposes and says:

      1.    I am a thirty-six year old married father with three kids. After graduating high school in 1994, I attended University of Bridgeport for one semester in 2007, studying Business Administration.

      2.    I was hired by AUTO-CHLOR SYSTEM OF NEW YORK CITY, INC. (hereinafter "Auto-Chlor") on June 30, 2008 to be the Branch Manager of the branch office located in Bethel, Connecticut ("Connecticut Branch"), a position I still hold today. Auto-Chlor is a company that leases commercial dishwashing equipment to businesses in the restaurant industry, as well as providing maintenance to the commercial dishwashing equipment, delivering product and selling additional cleaning products to customers.

3. As Branch Manager, I am paid a salary and am responsible for the oversight and management of all things that occur in my territory. My job responsibilities include, but are not limited to, managing the branch employees, tracking inventory, customer relations, preparing annual budgets with profit and loss statements, payroll, employee's schedules, in addition to the hire and termination of the branch employees. As Auto-Chlor prides itself on providing its customer's round-the-clock service in emergency situations, I also assist the "on call" employee when needed to ensure that our customers are taken care of. In addition to my salary, I am also given full medical benefits, paid vacation, sick and holiday time, a retirement savings account, and my employer also makes annual contributions into my 401k profit sharing program based upon a percentage of my annual gross revenues.

4. There are currently eight employees that work in the Connecticut Branch, which includes myself, one Office Manager, one salesman, three route drivers, one installer and one rebuilder. The job duties are as follows: (a) the salesman signs up new business and/or resigns old business, (b) the installers install the equipment after a new customer is signed up; (c) the route drivers maintain the business on the routes by providing the customers with product, selling additional product outside their lease to the customers and to follow up with customers regarding delinquent payments; (d) the rebuilders rebuild and maintain the commercial dishwashing equipment; and (e) the office manager handles the accounts receivable, dispatches service calls, and handles other administrative duties, like reminding the route employees to turn in their paperwork and inputting the employees regular and "on call" hours into a Payroll Timesheet. In my

branch, all other employees report to me and I, in turn, report to the Vice President, Bruce Bertkau.

    5.    As noted above and will be discussed in further detail below, it explicitly states in our Employee Handbook that, in addition to their regular shift, all route employees (a/k/a employees who actually go out into the field) are responsible to work "on call" from time-to-time to ensure that our customers can reach someone at any time, day or night, in the event of an emergency.

    6.    Our payroll at Auto-Chlor is done on a bi-monthly basis that centers around Auto-Chlor's service schedule, which means that the payroll is broken up into 13 four-week periods per year with one additional week every five years. To put it more simply, the employees receive two paychecks per period, or one paycheck every two weeks, for thirteen periods and, once every five years, they receive one additional paycheck for what we call "Period 13A". To record the employee's time, the employees (a) punch in on a time clock every day when they arrive at work; (b) punch out for their mandatory meal breaks if they are in the office, and, if they are in the field, they either handwrite it on their timecard or report it to the Office Manager when they return; and (c) then punch out at the end of the day for all regularly scheduled shifts.

    I believe that this policy is also outlined in the Employee Handbook that is supplied to every employee when they start work. I am almost positive that it states in the employee handbook that every employee is required to take a lunch break each day, but, in any event, the employees have also been advised of this both orally and in writing on numerous occasion.

7.      Depending upon the total number of route employees, our route employees are required to be "on call" approximately once every four to five weeks. The "on call" time is done on a rotation schedule with the other "on call" employees. To put it more simply, the route employees take turns being "on call". When an employee is "on call", they are not required to be in the office, but rather are free to go about their business unless an emergency call comes in from a customer. If a route employee is "on call" and cannot fulfill part or all of his "on call" week, it is that employee's responsibility to find someone to cover the day or week he is unavailable. The only other occasion I can think of where an employee would work on call more is if that employee volunteers to take another employee's on call shift or week to make some extra money, but that really does not happen all too often.

8.      How the "on call" system works in my branch is that, if no one answers an incoming call, our automated voicemail system states that "we are away from the office" and (a) to press "7" if it's an emergency or (b) leave a voicemail message and the call will be returned during regular business hours. If the customer presses "7" an alert is sent to the "on call" driver's cell phone to let them know that there is an emergency that needs to be responded to. The "on call" person then calls the office and retrieves the message. The "on call" is also required to call in to check the voicemail messages periodically to see if a customer left a message without pressing "7".

9.      After listening to the customer's message, the "on call" person is then required to begin filling out an "on call" log setting forth: (a) the name of the customer; (b) a brief description the problem to which the "on call" person is responding; (c) the

4

date; (d) the time the "on call" person left his or her home to respond to the call; and (e) the name of the "on call" person. After the employee arrives at the location, he or she must also note the time of departure on a Customer Service Report (CSR) as well as the information pertaining to the work performed so that the customer's account can be properly documented. After the employee has finished with a customer, he is then required to have the customer review and sign the CSR. When the employee returns home, he is required to document the time he arrived at home on the "on call" log.

10. The "on call" person is required to turn in their "on call" logs and CSRs from the prior evening to the Office Manager on the next regularly scheduled work day. Thus, the "on call" employee is required to turn in his Monday night "on call" log and CSRs to the Office Manager on Tuesday morning when he comes into work, and is likewise required to turn in his weekend "on call" logs and CSRs to the Office Manager on the following Monday. The Office Manager then transfers the data from the "on call" logs and timecards into a Payroll Timesheet kept in our computer system, and is also responsible for entering the CSR into the Customer Route History and then filing the same in that customer's file.

11. At the end of the payroll period, the Office Manager then forwards a computer printout with the employees' hours for the entire pay period to me for my review. I then look over the payroll to ensure that there is nothing out of the ordinary contained therein, such as a sick or holiday day accidentally left on the electronic timesheet from the week prior that the Office Manager forgot to take off. If there appears to be information missing from the Payroll Timesheet, or if something looks off, I contact

my Office Manager to double check the hard copies for accuracy and, if accurate, I contact the employee to inquire about the discrepancy or to seek further information. Once the discrepancy or missing information has been updated, the Payroll Timesheet is then put into final form and is emailed to our Payroll Administrator.

12.   The Payroll Administrator collects and reviews the payroll from all of the branches. If the Payroll Administrator sees anything that raises a red flag (i.e., sick pay repeated on the same day two weeks in a row), she contacts me to confirm that the Payroll Timesheet is accurate. I then look at the record she has flagged and either look at the hard copies of the records myself to confirm or request that my Office Manager review the same. If there is a question that cannot be answered by simply looking at the documents, I then contact the employee to discuss the issue and report back what I learn to the Payroll Administrator. In any event, I have never reported to the Payroll Administrator anything other than what is set forth on the documents and/or what the employee has advised me. Once the timesheets have all been collected and reviewed, they are then sent to ADP who prepares our payroll.

13.   I also do not recall an employee ever complaining to me that we messed up on his hours. If there was an error, it clearly would not have been advertent as my Office Manager has no reason to type anything into the spreadsheet other than what is reported on the documents. If an employee ever thought I, or my Office Manager, input his time incorrectly, he would know right away as every employee is provided with a detailed paycheck stub that itemizes his or her hours for the week and he would certainly be able to bring it to our attention.

14. Moreover, there is a clear procedure set forth in the Employee Handbook for an employee to report any inconsistency or issue like this. The Employee Handbook requires that an employee promptly report anything like this to me so that I can investigate his or her claim. If the employee is unhappy with the results of any such investigation, the employee is required to then request a meeting with the Regional Manager, Michael Bugiada, to discuss the issue. If the employee is still not satisfied with the results after he speaks with me and Mike, then he or she is required to file a formal complaint in writing with the Human Resources person, who will perform an independent investigation and then issue a decision. In four and a half years I have been working for Auto-Chlor, though, I have never had an employee complain to me that I ever shorted his hours and am not aware of any complaint being filed with HR in this regard.

15. While I cannot speak about what happened with these individual plaintiffs as I do not believe that I have ever worked with them, I can say under penalty of perjury that I have never been told to shave an employee's hours by any supervisor or owner of Auto-Chlor and I can also say under penalty of perjury that I have never, ever shaved an employee's hours regardless of whether I thought that employee was padding their "on call" time. I am aware that it is Auto-Chlor's policy to question any employee who we think is taking advantage of the "on call" honor system, but it is also Auto-Chlor's policy to pay the employee for the reported time, even if excessive, and to then terminate that employee if we have reason to believe that they are stealing from the company by misreporting their time.

16. I really find it odd that the plaintiffs are claiming that Auto-Chlor supposedly has a policy of shaving employees' hours as I do not know who would be shaving those hours. No one involved in inputting the employees' time into the computer system or reporting the same to our payroll company has anything to gain from shaving an employee's hours. There is simply no motive. You report your time accurately, or we pay you for your time and then replace you with someone else from a long list of people out of work right now who will gladly take your position that pays you well over the minimum wage and do their job honestly and with integrity. In any event, the proof is in the pudding as there are so many duplicate recordings of the employees' time in written logs, CSRs, timecards, spreadsheets and ADP records that it will be clear from the facts herein that it is evident that the plaintiffs are not being honest in this case.

17. In response to the specific allegations made in the Complaint, it is my understanding that the plaintiff named in the Complaint is essentially making three claims: (i) he was supposedly not paid time and a half for all hours worked in excess of forty hours in one week, (ii) Auto-Chlor supposedly did not compensate employees for their travel time while "on call", and (iii) that Auto-Chlor supposedly had an obligation to clean the employees' uniforms and failed to do so. None of these claims are true.

18. As to plaintiff's first claim, as stated above, we maintain duplicate copies of our payroll records in many different forms, so I suspect that the plaintiff's first claim will be easily disproven as Auto-Chlor always pays its employees for all hours worked in excess of forty hours in one week. In fact, on the branch level, we just type in what is in their timecards and "on call" logs, ADP then takes that information and pays the

8

employees in accordance with the law, which requires that all employees be paid time and a half for all hours worked in excess of forty hours in one week. In any event, I swear under penalty of perjury that it is my experience over the past four years that Auto-Chlor pays its employees time and a half for all hours worked in excess of forty hours in one week.

19. Plaintiff's second claim that Auto-Chlor does not compensate the "on call" employees for their travel time is just absurd. While I cannot say with authority what these particular plaintiffs reported in their individual payroll records, everyone knows that the "on call" employees are compensated from the time they leave their house until the time they return home. I can say with authority that, for the four years that I have been a Branch Manager with Auto-Chlor, every single one of my employees have been told to report their time from front door-to-front door and that I have compensated them for every minute of the time reported.

20. As to plaintiff's third claim, my branch is not located in New York, I have been advised that this is a New York State requirement, and my only understanding of this requirement is from speaking with our lawyer. As such, my only comment with regard to this claim is that I know that the uniforms for the New York branches are provided by Aramark, who is responsible for cleaning and maintaining the uniforms.

21. With regard to the claims made by the three individuals in the affidavits submitted in support of this motion, while I do not believe that I have ever interacted with any of them, I can, however, speak to their individual allegations based upon my personal experiences at Auto-Chlor over the past four and a half years. It appears that, while they

9

do not assert the third claim in the Complaint with regard to the uniforms, they essentially reiterate the other two claims made in the Complaint and my response remains the same. Auto-Chlor does not have a policy of refusing to pay their employees overtime. It has been my experience over the past four years that, to the contrary, I have been very clearly told that employees are to be paid time and a half for all time worked in excess of forty hours in one week and I have always paid my employees accordingly.

22. As to the plaintiffs' claim that they were not compensated for all of their "on call" time and that they think there are other employees who have also not been compensated for all of their "on call" time, I can state that I have never knowingly or intentionally failed to pay an employee for all of their "on call" time they have reported to me. I can also state that I have ***never*** heard any other branch manager say that he had ever shaved any time off of an employee's "on call" time. I can similarly state that I have never been asked or instructed by any of my superiors to shave an employee's "on call" time. I can further state that I cannot recall one single occasion that any of my employees have ever told me that they, or anyone they worked with or spoke to at any other branch, have ever had their "on call" hours shaved by anyone. Again, there is simply no motivation to shave an employees' time as neither my, nor my Office Manager's, compensation is not based upon another employee's time paid.

23. As there is no such policy at Auto-Chlor despite the false claims made by plaintiffs in their Complaint and affidavits, it is respectfully submitted that, not only is it my belief that there no other employees similarly situated to the plaintiffs, I likewise do not believe the plaintiffs to be similarly situated with themselves as their claims just do

10

not add up. As such, it is respectfully requested that plaintiff's request for conditional certification be denied and for such other, further and different relief as may seem just, proper and equitable under the circumstances.

ROBERT SMITH

Sworn to before me this
6th day of December 2012.

NOTARY PUBLIC

DANIELE D. DE VOE
Notary Public, State of New York
No. 02DE6146226
Qualified in Nassau County
Commission Expires May 15, 2014