UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

JOSE HENRY GONZALEZ,
Individually and on behalf of all
others similarly situated,

                              Plaintiff,

                    -against-

AUTO-CHLOR SYSTEM OF NEW YORK
CITY, INC., et. al.,

                              Defendants.
------------------------------------------------------------X

**AFFIDAVIT OF MICHAEL
BUGIADA IN OPPOSITION
TO PLAINTIFF'S MOTION
FOR CONDITIONAL
CERTIFICATION**

Case No. 12-CV-3465 (BMC)

STATE OF NEW YORK   )
                    SS.:
COUNTY OF NASSAU    )

        MICHAEL BUGIADA, being duly sworn, deposes and says:

        1.      I am a 44 year old married man who has 2 kids aged 24 and 19. After

graduating high school in 1986, I went right to work as I needed to support myself. I

worked for Honda building generators for a few years.

        2.      I began working for AUTO-CHLOR SYSTEM OF NEW YORK CITY,

INC. (hereinafter "Auto-Chlor") when I was approximately 21 years old, or in 1989.

Auto-Chlor is a company that leases commercial dishwashing equipment to customers in

the restaurant industry. When I first started working for Auto-Chlor in 1989, I worked in

the warehouse. In the years between 1989 and 2012, I have done pretty much every

single position at Auto-Chlor and have literally worked my way up from the bottom to

the top. In 2000, I was promoted to Branch Manager for the branch located in Plainview,

New York ("Plainview Branch") and was promoted to Regional Manager in 2005. As I do not think that this Court wants to read through a chronology of all the jobs I have held in the past 23 years, I am going to focus my attention on the period from 2006-2012, which I have been informed is the relevant period herein.

3.      As noted above, I have worked as Regional Manager since 2005, which is the same title I hold today. As Regional Manager, I am responsible for the oversight of the three branches located in New York, which are the Bronx Branch, Queens Branch and Plainview Branch. I was formerly in charge of the Connecticut Branch, as well, but gave up that responsibility when we opened the Bronx Branch in late 2010. More particularly, I oversee the three Branch Managers that run the actual branches, review their payroll before it gets sent to the Payroll Administrator, oversee the branch budgets, among other duties. As I stated above, the Branch Managers of the New York locations report to me, and I report to Bruce Bertkau, the Vice President.

4.      Sam Villanueva has been the Branch Manager of the Queens Branch since 2006. Raul Gonzalez has been the Branch Manager of the Bronx Branch since it opened in late 2010, and had previously worked in the New Jersey Branch. Ron Lacey is currently the Branch Manager of the Plainview Branch, and he was preceded by Paul Rivera. Before being transferred to the Plainview Branch, Ron Lacey worked at the Queens Branch for six years as a route driver, then a salesman and finally as a route supervisor.

5.      For brevity, I submit that I have reviewed the affidavits of the three Branch Managers submitted in opposition to plaintiff's Motion for Conditional Certification, and

2

I agree that the procedures set forth in each Branch Manager's affidavit accurately reflects the practices at each particular branch. I have also read the affidavit of the Bruce Bertkau and agree that the hierarchy and corporate policies set forth in Bruce's affidavit accurately reflect my understanding of Auto-Chlor's policies.

6. As to the specific claims made by these three individuals, it is respectfully submitted that a vast majority of the claims made in their affidavits are not true. I will focus the remainder of my affidavit responding to each individual's affidavit.

### *...as to the claims made by Jose Henry Gonzalez*

7. I am familiar with JOSE HENRY GONZALEZ ("Henry") as Henry worked as an Installer at the Queens Branch from June 2007 until January 2011. Henry was a nice person, but a terrible employee who was bad at his job and did not take criticism well. Henry's poor work performance drew complaints from the customers, the salespeople and the office staff.

8. I cannot tell you how many times I told Sam to fire Henry and Sam would defend Henry, saying that he wanted one more chance at teaching him how to do his job. I really do not know how Sam put up with Henry for as long as he did, though, as he would often be confused when he would come into work about what he had to do. Henry also could not follow direction even if those directions were clearly written on the job board. Sam would tell me that Henry would be scheduled to do two installations in one day, one in the morning and one in the afternoon. The appointment times for the installations would be clearly printed on the job board and Henry would often mess it up, not showing up at the customer's location when he was supposed to and missing

appointments.

9.     When Sam would speak with Henry about his performance, Henry would actually criticize Sam and tell Sam that *he* did not understand how to Henry's job as he never worked as an Installer.  Henry would also often try to put me in the middle of his disputes with Sam, and I would tell Henry that he needed to speak with Sam as Sam was his boss.  Yet, every time Henry did not like what Sam was telling him, he would try to get me involved and complain to me about Sam riding him.  Perhaps it is because Henry was older than Sam and I am closer to Henry in age, but it was like Henry did not respect what Sam had to say and he always came to me to verify.  As I did not want to undercut Sam as he was Henry's boss, I would always tell Henry that he needed to be speaking with Sam.

10.     I think I recall reading somewhere in his personnel file that, on one occasion, Sam questioned Henry about how he was calibrating a machine or measuring the Parts Per Million (PPM) for chemicals being dispensed into a dish machine and Henry told Sam he was "eye-balling it".  It could make someone sick if the wrong amount of chemical is being dispensed into a machine, which could also end up bankrupting the company if there was a lawsuit.

11.     The situation got so bad with Henry that Sam would often speak with Bruce and myself about what to do as he was just not understanding how to do his job, he was angering customers as he was reportedly rude to the customers and their staff, and he was angering the salespeople as their sales were hurting because customers were complaining about Henry's attitude and incompetence as much of his work had to be fixed.  Bruce and

4

I both told Sam to cut him loose and find someone who could do the job, but Sam always responded that he wanted to give Henry one more chance to improve. That has seriously been management's biggest complaint about Sam is that he keeps people on too long and does not like to fire anyone.

12.    I do not recall when it was, but Sam finally fired Henry one day when he was speaking with him about a customer complaint, I think it was because Henry was demanding food or tips from the customers. Henry became really argumentative and starting criticizing Sam in front of the other employees. Sam fired him for insubordination, but, before he processed Henry's termination papers, Henry called to ask for his job back. I told Sam not too take him back, but Sam did and Henry's poor work ethic and performance continued.

13.    On the day Henry quit, in January 2011, Sam called me to tell me what happened and that he thought Henry just needed a day to cool off. More particularly, Sam told me that Henry came into work all cranky about having to work "on call" the night before and walked up to Sam with several demands. Sam told me that Henry wanted more money, a helper and to not work "on call" anymore. Sam told me that he advised Henry that (a) he did not think that I would approve a raise considering all the complaints in his personnel file, (b) I definitely was not going to authorize a second person because he could not do his job, and (c) there was no way he was going exempt Henry from "on call" while other employees who had worked their longer were required to work "on call". Henry apparently told Sam to fire him if Sam could not give Henry what he wanted. Sam told him to go home and cool off as he did not want to fire him.

Henry, apparently, would not leave and demanded that Sam either get him what he wanted or fire him so that he could sit at home and collect unemployment.   While Sam technically fired him as he told him something like "okay, your fired," it is my position that Henry quit as you do not demand stuff and then ask to be fired as that is quitting not getting fired.

14.     In any event, after I heard what went down and that this conversation happened in front of other employees, I told Sam to not look back as this was good riddance to bad rubbish.  Well, a couple of days later, Henry apparently called asking for his job back as I suspect that his wife was not all too happy that he quit a good paying job with benefits and a retirement plan.  Sam called me to tell me that Henry had called and that he was thinking of giving him one last chance as Henry said he was "sorry."  I told Sam that I did not care what Henry said, but that Sam would be out of his mind to hire this guy back.  At that point, I put my foot down as Sam's boss, and told Sam not to hire him back under any circumstance.

15.     Henry apparently called another employee, Ruben Ochoa, in an attempt to convince me to let Sam hire him back.  When that got him nowhere, Henry actually had the audacity to call me to ask that I please let Sam hire him back, and I told him to "go fly a kite" or something like that.

16.     With regard to the specific allegations made in Henry's Complaint, it is my understanding that Henry makes the following claims in his Complaint: (i) he claims that he was supposedly not paid time and a half for all hours worked in excess of forty in one week; (ii) he claims that Auto-Chlor supposedly did not compensate employees for their

6

travel time while "on call", and (iii) he claims that Auto-Chlor supposedly had an obligation to clean the employees' uniforms and failed to do so.

17.  As to Henry's first claim, it is not true.  Henry was always paid time and a half for all hours worked in excess of forty in one week.  Henry's Payroll Timesheet and ADP records clearly reflect that Henry is lying. Henry's second claim is also a complete lie as everyone knows that "on call" time is compensated from the minute you leave your home until the minute you get back to your home.  I am not going to spend much time on this point as it appears from what he said in his affidavit that he abandons this claim.

18.  I am also not going to spend much time on his third claim as it also appears that he has abandoned this claim based upon what is in his affidavit.  Briefly, it is my understanding that there is no federal requirement that we give any employee a "uniform allowance". It is also my understanding that New York Law does have a section that deals with the "uniform allowance", but that that the cases and opinion of the Dept. of Labor is that this section only applies to minimum wage employees, which Henry certainly was not.  In any event, for the purposes of this motion, Aramark provides us with our uniforms and is responsible for their care and maintenance.

19.  As to the claims made by Henry in his affidavit, it appears that he has come up with a new argument as he knew that his first ones would be easily disproven.  Now he admits that he was compensated from the time he left his home until the time he returned home, but now claims that Sam--- the man who singlehandedly saved his job numerous times ---supposedly had some sort of dastardly scheme to "short" or "reduce" his "on call" hours and claims that this supposed conspiracy to cheat employees is

supposedly franchise wide. This argument is totally made up. There is no policy at Auto-Chlor that the Branch Managers are to short the employees any hours and there would be absolutely no reason for a Branch Manager to do so.

20.     Henry's claim gets even more absurd when you look at his claim that he supposedly regularly worked one "on call" week every four weeks and that he would supposedly be cheated out of 5-10 hours every single week. First of all, in the time period between 2007-2012, it is impossible that anyone regularly worked "on call" every four weeks based upon the number of "on call" employees who work at this branch at any given time. This is one of the larger branches, so there are almost always 6-8 employees sharing the "on call" rotation at any given time. I am not saying that it is impossible that Henry covered someone else's shift at some point or that, if we were short a few employees, he *may* have worked "on call" twice in a two month period. What I am saying is that there is no way Henry worked "on call" every four weeks for the entire period he worked for Auto-Chlor from 2007-2011.

21.     The number of hours he claims he was cut also makes no sense as the average "on call" person in this branch only reports 8-15 "on call" hours on the average week, and maybe reports 20 hours on a really busy week. So, for Henry to be shorted 10 hours every time he was "on call", it means that he would have been paid for practically no "on call" time at all, and I am willing to bet that is not what his payroll records reflect.

22.     Just the fact that he claims that he was shorted 5-10 hours every week makes no sense to me. Who would stay at a place where he thought he was being shorted 5-10 hours and not say anything? I am at that branch all the time and he had no problem

8

calling me to complain about everything else Sam did that Henry did not like or to go above Sam to try to convince me to give him his job back. One would think that, if this was really going on, Henry would not have hesitated to call me to complain like he did for every other issue he had with Sam.

23.     In any event, Auto-Chlor has a clear cut policy for lodging complaints in our Employee Handbook that is given to every single employee, Henry included. The Employee Handbook required that Henry report any grievance to Sam and that if he did not like what Sam had to say, he had to speak with me.  If he did not like what I had to say, he was required to submit a written complaint to the Human Resources (HR) person and the HR person would perform an independent investigation and issue a report.

24.     I believe Sam when he says Henry *never* complained to Sam that he thought his hours were being shorted.  I **know** that Henry *never* told me that he thought his hours were being "shorted".  I also know that Henry never submitted a written complaint to HR that he thought his hours were being shorted as there would be a notation of that in his personnel file and I am sure he would have attached a copy of that written complaint to his motion if he did.

25.     While I do not know how significant it is, there is no "technician" position at Auto-Chlor.  As stated by the Branch Managers, there are only about half a dozen available positions with a branch location, and "technician" is not one of them.  Henry was an Installer and he installed dishwashers.  None of the people Henry lists in paragraph 4 were installers at the time Henry was there because we only have one installer in each branch.  I also do not believe that Henry was talking to any technicians in

9

Plainview or New Jersey as he would have no reason to interact with anyone from any other territory and I do not know that he could speak with the other employees as there was a language barrier as Henry did not speak English well.  In fact, there was such a language barrier that, when Henry was "on call", I believe we had to have another employee answer the customer's call and then that employee would call Henry where to go as several customers had complained that they could not understand him on the phone.

26.    While I agree that Henry's shift was probably from 8:00 A.M. until 5:00 P.M., it is a lie that Henry never took a break as he would have been fired without question if he did not as Auto-Chlor is very strict about employees taking breaks.  As stated above, I do not think that Henry correctly remembers the process that occurred when he was "on call" as I believe that another employee had to take his calls and then tell him where to go and what the problem was.  I do, however, agree with Henry's admission in paragraphs 8-9 of his affidavit that he knew he was compensated for his "on call" time from the time he left his house until the time he returned home.

27.    I believe that I have responded to all of the claims that Henry made in his affidavit, but, in the event I left anything out, I have read the affidavits of Bruce Bertkau, Sam Villanueva, Ron Lacey and Raul Gonzalez, and agree with everything set forth therein.

28.    In short, it is respectfully submitted that Henry was paid for all "on call" hours he reported, Henry was paid time and a half for all hours worked in excess of forty in one week, and Henry was not entitled to the New York State "uniform allowance" as he is not a minimum wage employee.

*...as to the claims made by Richard Keating*

29.     I worked with Richard Keating ("Richie") from in or about 2001 until 2011. Richie was an all right employee when I first started working with him in 2001 as a Route Driver. All I can remember about the period when we *first* started working together is that Richie had some organizational and cleanliness issues, but otherwise made his sales for the most part. From 2001 until 2006, however, his work performance declined rapidly as he was no longer physically able to do his job. We were not sure what the problem was at first as he was a highly recommended re-hire from Basic Leasing, the company that previously employed Richie. At some point, we learned that Richie had diabetes, type II I think, and that was what was slowing him down.

30.     By 2005, Richie just could not work his route anymore as the diabetes had slowed him down so much. To accommodate Richie's condition, we switched him to Rebuilder sometime in 2005 or 2006 as it would give him more time in the shop and less time on the road. While we thought it was going to be a good fit because we did not want to fire the guy as we felt bad for him, he just was not getting the work done as a Rebuilder, either. Sam would give him like five things to do and he would only finish one of them.

31.     The other problem was that, when we did send Richie out on the road to do a repair, Richie was often caught lying about doing service calls that he never actually did. I do not know if the lying was because the diabetes had slowed him down so much that he did not think he could get the job done, or what, but there was a period from around 2007-2009 when we were constantly catching Richie in lies. Richie would lie and

say he was at a location fixing a machine, then the customer would call to complain that no one had showed up. He sometimes would have no answer for why he lied, and, other times, Richie would lie again to cover up his first lie. On one occasion, he lied and said the customer was "not open" when we knew they were. On another occasion, he would lie and say that he could not do the work because the work required a plumber and we would send someone else who would fix the problem in ten minutes.

32.     The final issue we had with Richie is that he was stealing from the company by using the Auto-Chlor credit card to put gas in his personal vehicle. Sam and I had several conversations about what to do about Richie as he was "filling up" his company truck a couple of times a week. As Richie had been with us so long, it was hard to accuse him of stealing. Richie got sick before we had an opportunity to address this issue with him and, once Richie was really sick, we handled him with kid gloves as we felt bad for him.

33.     The lies got so bad by the end of 2009 that I was ready to tell Sam that he had to fire him when Richie's health really took a turn for the worse. I believe that Richie's doctors told him that they were going to have to cut off his foot as the sores on his foot from the diabetes had become so infected. Well, Richie was out on short-term disability for much of 2010, which kind of eliminated the need to fire him. I am pretty sure he was on short-term disability from around February until May 2010, and then went on long-term disability in May and I am not sure when he came back, but I think it was sometime in the fall as he did not want to lose his insurance.

34.     When he came back, his work performance was ten times worse because he

was even slower than he was before and also complained that he was losing his sight from the diabetes. Now, we really felt like we could not fire him because the poor guy was losing his sight, but we could not keep a guy working for us who could not work. We were also, naturally, afraid of a lawsuit if we did fire him even though he could no longer do his job. Sam, Bruce and I had many discussions about what to do as we could not really send a guy out on the road in a company vehicle when he was complaining that he could not see.

35.     He worked when he could at the end of 2010 and part of 2011. Once again, it worked out that we did not have to fire Richie as he finally realized, himself, that he could no longer do his job sometime in October 2011 and applied for long-term disability. From what I see in his personnel file, he was apparently out completely from October 2011 until he finally officially resigned on April 12, 2012. It should be noted that nowhere in Richie's letter of resignation does Richie claim he was ever shorted hours. While he does not make that claim, he does thank Auto-Chlor for sticking with him for ten years. I believe Richie is still on permanent disability today.

36.     As to the particular claims in his affidavit, Richie worked as a Route Driver from 2001 until 2006, and then worked as a Rebuilder from 2006 until 2012. Richie's main duty was never to install dishwashers, but Richie's main duties as a Route Driver were to sell soap and service customers, just as his main duties as a Rebuilder was to rebuild and refurbish dishwashers. It was Henry's job to install the dishwashers, not Richie's. I do not recall anyone named "Abraham" ever working at the Queens Branch and Henry did not have the same duties as Richie as Henry was an installer and Richie

13

was rebuilder.

37.     Richie did not make $17.00 an hour the entire time he worked at Auto-Chlor.  In fact, his pay fluctuated with the position that he held.  As a Route Driver, he would have likely made around $11.00 per hour plus commissions on his hand sales.  When Richie was a Rebuilder, he *may* have made $17.00 per hour for the entire time as his work performance was poor and did not merit a raise.

38.     I believe that Richie's scheduled shift was from 8:00 A.M. until 5:00 P.M. on Monday through Friday, when he worked, but I do not believe that Richie did not take a lunch break as he would have been fired for not taking lunch breaks.  I further do not believe that a diabetic could go nine hours without taking a meal break.  In any event, I know that it is not true that Richie never took lunch.

39.     From 2006 until 2012, Richie was never "on call" once a week.  It was more like once every six to eight weeks, when he could work.  I agree that Richie was compensated his "on call" time from the time he left his house until the time he returned home when he was "on call".  I also agree that Richie was responsible for turning in his Customer Service Reports (CSRs) and "on call" logs on his next regularly scheduled shift, but I also recall Sam complaining that Richie was one of the employees who had a problem getting his paperwork in on time and he was one of the holdups when payroll had to be completed.  In fact, I think that Richie was often turning in his "on call" logs late so that some, or all, of his "on call" time had to be included on his next paycheck.

40.     I do not believe that Sam was shorting Richie's hours as Sam would have no reason to do so.  As stated by Bruce in his affidavit, perhaps the difference between

14

what Richie was paid and what he claimed on the logs differed on occasion to reflect the hours he falsely reported but later admitted that he did not work. I do not know if this is what he was talking about, but, if it is, then he is embarrassing himself as it is well documented in his file that he repeatedly lied about doing service calls that customers and other employees would advise were never made. He was written up several times for this and he is not entitled to be paid for work he did not actually do. Other than the work Richie falsely reported, I am not aware of one single other time that Richie reported hours for which he was not paid.

41.     Richie was always paid time and a half for all hours worked in excess of forty hours in one week. This was not something in Sam's or my control as we just report his hours to ADP and ADP prepares the payroll in accordance with the law. The law requires time and a half for all hours worked over forty in one week, and that is how ADP pays our employees.

### *...as to the claims made by Paul Argento*

42.     I vaguely remember Paul Argento ("Paul") as he only worked for us for a few months as a Route Driver and I remember that he did not work out as he was a young kid who was looking for a paycheck, not a career. I really do not remember if Paul was fired or quit, but he would have been fired soon even if he did quit as he was not making his sales. Sergio, his supervisor, used to complain about Paul all the time. I think that I remember the Sam telling me that Paul did not get along with the Office Manager either as he would fight her about his paperwork.

43.     In any event, Paul was not a technician as no such position exists, but rather

15

Paul was a Route Driver. Paul's regular shift probably was from 8:00 A.M. to 5:00 P.M. and Paul took a break every day because Paul would have been fired if he did not. Paul worked for us for about 8 months and, maybe, was up on the "on call" 4 rotation times in that eight months considering the number of "on call" employees at that branch. Paul was compensated for his "on call" time from the time he left his home until the time he returned home. The scenario Paul describes where he would get a voicemail and respond to a customer's emergency call is mostly accurate. It is also accurate that Paul was supposed to turn in his paperwork, which included his CSRS and the "on call" log, on his next regular shift. It is also true that Paul did not like to do his paperwork or to turn it in on time, so the Office Manager and Paul would fight often about his paperwork.

44.   It is not true that anyone intentionally reduced Paul's hours as alleged in his affidavit as no one had any reason to reduce his hours. There is no way in the world that Paul's hours would have been reduced 5-10 hours a week, and that he would not have said anything about it to me. There is also no way that his hours were reduced 5-10 hours a week because that would mean that Paul, essentially, was not paid for any of his "on call" time, which is not what is reflected in his payroll records.

45.   As to Paul's so called "witnesses", I will let Ron Lacey's affidavit speak for itself as Paul says that he supposedly had a conversation with Ron about what they were paid and that they were supposedly being shorted hours, which Ron admits never happened and states that Paul is lying.

## CONCLUSION

46.     In light of the foregoing, it is respectfully submitted that it is glaringly

apparent that the plaintiff and his attorney only filed this motion to go on a fishing

expedition with the hopes of finding anything to justify this frivolous lawsuit.  As such,

the defendant respectfully requests that plaintiff's instant motion be denied in its entirety

and that this Court grant such other, further and different relief as may be just, proper and

equitable under the circumstances.

MICHAEL BUGIADA

Sworn to before me this
7th day of December 2012.

NOTARY PUBLIC

VIRGINIA A RICCIO
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01RI6260011
Qualified in Suffolk County
Commission Expires April 16, 2016